## NORTHERN PACIFIC RY. CO. v. WEINBERG et al.

### No. 313.

District Court, D. Minnesota, Fifth Division.

Nov. 18, 1943.

134

L. B. daPonte, M. L. Countryman, Jr., and F. J. Gehan, all of St. Paul Minn.,

and Donald D. Harries (of Gillette, Nye, Harries & Montague), of Duluth, Minn., for plaintiff.

Harry E. Weinberg and Albert R. Scanlon, both of Duluth, Minn., for defendants.

NORDBYE, District Judge.

The ordinance reads as follows:

"Section 1. (a) That the word 'person' as used in this ordinance is defined to mean any person, firm, partnership, association, corporation, trustee, receiver or other court officer, and the plural of each.

"(b) That the word 'locomotive' as used in this ordinance is defined to mean any and all railway engines, however propelled, when in use in the switching or transferring of railway cars upon railroad tracks within the corporate limits of the City of Duluth.

"Section 2. That to promote and protect the safety and welfare of employes operating locomotives on railroad tracks within the corporate limits of the City of Duluth, and to protect and promote public safety within the corporate limits of the City of Duluth where railroad tracks cross streets or avenues at grade, it shall be unlawful for any person to operate any locomotive, or cause or permit the same to be operated, upon any railroad tracks within the corporate limits of the City of Duluth, unless each such locomotive shall be then manned with a crew of not less than one qualified engineer or operator and one qualified fireman or helper.

"Section 3. That any person violating the provisions of this ordinance shall, upon conviction thereof, be punished by a fine not exceeding one hundred ($100.00) dollars, or by imprisonment for a period not exceeding eighty-five (85) days.

"Section 4. That each day any such locomotive is operated in violation of the provisions of this ordinance shall be deemed a separate offense.

"Section 5. That this ordinance shall take effect and be in force thirty (30) days from and after its passage and publication."

It is recognized by all parties that the Duluth Union Depot & Transfer Company is the so-called service unit of the plaintiff herein. The Duluth Union Depot is the passenger terminal of the Northern Pacific Railroad and other roads entering Duluth, and the Duluth Union Depot & Transfer Company services some nine passenger trains which use the Union Depot as a terminus. Generally speaking, the servicing consists of moving empty coaches to a train wye near Twentieth Avenue West in Duluth, the movement to the coach yard for servicing, and the transfer from the coach yard to the Union Depot. The switch movements may be described more in detail as follows:

The switch engine moves the empty passenger coaches some fifteen blocks through the yards of the plaintiff company to the wye. In this movement, the engine heads the train. After the train completes its movement through the wye, there is a backward movement of some blocks to the part of the yard known as the coach yard, where the coaches are cleaned and serviced. Usually an hour or so before train departure, the particular train is placed on one of the seven tracks of the depot, and when departure is made a regular road engine is used. In the movements referred to, the switch engine is at all times ahead of the train except in passing over one of the arms of the wye and in moving cars to and from the coach yard. However, at all times the movements of the engine in switching or backing are controlled by the switch crew. The track over which the movement takes place is free from curves except at the wye and except a slight curve in the train movement as it passes over the switches leading to the coach yard. The yards, however, at the place where the switching operations and movement take place are wide and spacious and free from obstruction except at Twenty-first Avenue West, where there is a building at the northeast corner of the street intersection with the tracks. All of the operations are on the private right-of-way of the plaintiff company except where the movement crosses Twenty-first Avenue West, a public crossing approximately at a point some fifty feet from its terminus on certain private property. While in the past the switching operations referred to at times cross Fifth Avenue West, which is protected by a switchman, gates and warning bell, it is stipulated that the proposed switching operation which is sought to be free from the mandate of the ordinance in question shall not cross Fifth Avenue. The usual speed of the switching engine as it moves in these operations is from ten to twelve miles an hour and does not exceed fifteen miles per hour. Across these tracks are some four viaducts for foot passengers which are an average distance of some four blocks apart, but notwithstanding

these means afforded for pedestrian traffic, there are numerous paths across the tracks which are used by licensees as well as trespassers. However, when persons cross the tracks on any of the paths that may be found there, such persons would be in full, unobstructed view at all times. The terrain is flat and the width of the yard is substantially three hundred feet.

These switching operations have heretofore been carried on by a steam locomotive, with an engineer and a fireman in attendance and a switch crew of three trainmen. Plaintiff, intending to perform these services by the use of a small one-man Diesel engine, purchased from the General Electric Company a 44-ton Diesel electric locomotive at a cost of $38,150. This Diesel engine is designed and constructed for operation by one man. After the contract of purchase, but before the engine was delivered, the City of Duluth passed an ordinance forbidding, under heavy penalties, the operation of any engine when in use in the switching or transfer of railway cars upon railway tracks within the corporate limits of the City unless such locomotive be manned by a crew of not less than one qualified engineer or operator and one qualified fireman or helper.

The cab of the Diesel in question is centrally located midway between the front and rear of the body of the engine. The engineer sits on the right side of the cab, or he may stand. In either position, he has an unrestricted 360 degree view. While the evidence is not in agreement as to the impairment of his vision on the left side while he is seated, it fairly appears that the maximum impairment on the left side is approximately a distance of fifteen feet from the left rail and a distance of some twenty-five feet immediately ahead of the engine. This impairment is apparently due to the height of the engine casing or hood fore and aft. However, when the engineer stands, he can see "practically everything." The cab is equipped with mirrors which are, or can be, placed so as to enable the operator to see the track when he is seated without any substantial impairment. These mirrors may be installed on the inside or the outside of the cab. It does appear, however, that most operators do not use the mirrors in actual operation. The use of a small Diesel engine with one operator has been in general use by a number of railroads for some years. Many are thus used in switching operations in yards where train traffic is exceedingly dense; others are used on short road runs. The safety of operation of a one-man Diesel as experienced by numerous other railroads in switching and road service is fully sustained by the evidence.

Plaintiff contends that the ordinance is not authorized by the City Charter. In view of the conclusions hereinafter indicated, a lengthy discussion of this question is not suggested. It may be observed in passing that, under its Home Rule Charter adopted in 1912, the City of Duluth has, in addition to, and not limited by, the specific enumeration of powers in the 1900 charter, "all municipal power, functions, rights, privileges and immunities of every name and nature whatsoever." That this general grant in the Home Rule Charter confers power and authority tantamount to that granted under a general welfare clause seems apparent from the language of the Supreme Court of Minnesota in State ex rel. Zien v. City of Duluth, 1916, 134 Minn. 355, 361, 159 N.W. 792, 794, Ann.Cas. 1918A, 683, when that court stated in considering the language above quoted, "What is meant by 'all municipal power' is not defined, but as here used the expression is obviously broad enough to include all those powers which are generally recognized as powers which may properly be given to and be exercised by municipal corporations." Whether the City can enact legislation under a general welfare clause controlling switching operations on a railroad's private property is at least a close question. The showing herein would not sustain a finding that the health, safety and well-being of the public at large would be affected or jeopardized in any way by the operation of a one-man locomotive on the private property of the plaintiff. Certainly, this is true as applied to the limited operations of a 44-ton Diesel. It must be recognized, however, that the Minnesota Supreme Court has clearly enunciated the principal that charter powers must be liberally construed. Tousley v. Leach, 1930, 180 Minn. 293, 230 N.W. 788. Whether an ordinance is for the general welfare generally cannot be negated by a court unless it is clearly wrong; that is, the Council's estimate of the general welfare should be followed unless it is plainly erroneous. City of St. Paul v. Fielding & Shepley, Inc., 1923, 155 Minn. 471, 194 N.W. 18. However, in view of the conclusions hereinafter indicated, a final decision on this question is not necessary.

██ Reference is also made to the alleged lack of power of the City to legislate as to railroad crossings in view of the specific power lodged in the Railroad and Warehouse Commission. The Commission does not possess exclusive jurisdiction over all types of regulations pertaining to the safety of the public at railroad crossings. Its jurisdiction and prerogatives pertain only to those powers and regulations which the Legislature has given it power to promulgate and exercise. In so far as it has those powers, the municipalities are unable to exercise them since the granting of them to the Commission withdrew them from the municipalities. State ex rel. City of St. Paul v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 1933, 190 Minn. 162, 251 N.W. 275. However, a perusal of the powers granted to the Commission (see Section 4743-1 et seq., Mason's Minn. Stat. 1927) does not disclose any authority or right to determine the number or qualifications of persons who must serve on a locomotive at railroad crossings. In view of the observations made by the Supreme Court in Licha v. Northern Pacific Ry. Co., 1937, 201 Minn. 427, 276 N.W. 813, it would seem that such powers remain with the municipalities.

██ Assuming, therefore, but without deciding, that the ordinance in question is not invalid on its face, the question arises as to its validity under the special circumstances herein; that is, in light of the limited relief that plaintiff seeks with reference to the specified operations of the Diesel in connection with the switching operations conducted by the Duluth Union Depot Company. The ordinance, it will be noted, is without any limitations or exceptions whatsoever. Its effect is broad and sweeping. Any movement in railroad operations of an engine—Diesel, steam, or gas—in the yards of the plaintiff company without an engineer and a helper manning the engine at all times would contravene its provisions. The operation might be one which merely involved the movement of a switch engine a few feet, but, notwithstanding, the ordinance as drawn would apply. It is rigid and unyielding regardless of any exceptional circumstances which may pertain to the particular movement of the locomotive, the size thereof, the crew in attendance, the area in which or distance it is moved, or the condition of the weather. I construe the ordinance to mean that at all times when an engine is operated in switching or other railroad service it must be manned by an engineer or operator and a fireman or helper; that is, these two trainmen must be actually on the engine and in charge substantially in the same manner as on an ordinary steam locomotive. Therein lies its arbitrariness and unreasonableness which, in my opinion, results in its invalidity as applied to the facts herein. It may well be that, under some circumstances and conditions, the evidence presents at least a debatable question as to the necessity of having a 44-ton Diesel manned by two men in order to insure safety to the public and the employees. But that a 44-ton Diesel, with only the engineer and the switch crew in attendance, can be operated day after day in weather conditions and circumstances which are not adverse, with reasonable safety to the trainmen and the public, seems free from doubt after a careful consideration of all the testimony and a practical and realistic view of the entire situation. The switching operation which plaintiff seeks to carry on free from the effect of the ordinance is, of course, a very limited one. The number of lineal feet traveled is approximately a mile. The switching engine with its train of cars only crosses one highway open to the public. It is conceded that, in the contemplated operations, there will always be in attendance an engineer and a switch crew consisting of three trainmen. The foreman of the switch crew supervises and generally directs the switching operations. One switchman follows the engine, so to speak, relaying signals to the engineer. Another may be termed the field man. It is true that, where a steam engine manned by an engineer and a fireman is in operation with a switch crew, the switchmen do not feel obligated to ride in the cab or on the engine under any circumstances, but may do so if it is necessary or convenient. For many years, there has been a certain routine followed in such switching operations by reason of the fact that there is a fireman on the left-hand side of the cab of a steam engine. However, it must be clear that there is no reason why the particular routine must be followed in the event a Diesel is put into operation with an engineer alone in the cab. Certainly, if there are adverse weather conditions such as fog, rain, or snow, and the movements of the Diesel thereby become hazardous, one of the switchmen, in view of the very limited

operations contemplated, could ride in the cab with the engineer or on the engine if necessary, or be placed in such a position at all times that the engineer would have no trouble in obtaining the signals that may be given to him from time to time as to the movements necessary. A reasonable change in the routine placement of the men, which is customary under operations with a steam engine, in order to meet any changed conditions or extraordinary circumstances that might arise in the operation of the Diesel with the engineer alone in the cab, does not present any problem which should prevent the expeditious and safe operation of the contemplated switching operation. After all, it must be recognized that the engineer and three men are engaged in one operation. No good reason is suggested why an engineer and three switchmen cannot with reasonable cooperation render the movement entirely safe and practical. It may be pointed out that the maximum speed of the contemplated operation of this Diesel engine would not exceed fifteen miles per hour. The engine in question is especially constructed or designed so that one man can operate it with due safety. The vision of the engineer from his cab on the Diesel in question permits him to see the track ahead of him close enough to the engine so as to enable him to proceed forward or backward with reasonable safety. Then, again, it must be recognized that all switching movements of the engine are controlled by the signals of the switchmen, and the engineer does not move forward or backward in absence of a manual signal which he receives from one of the switchmen. In effect, therefore, he has not only the use of his own eyes and scope of vision, but in addition the aid and assistance of the eyes and observations made by the switchmen who are on the ground and directing the movement of the engine. Certainly, when we consider the large transportation busses, trucks and streetcars which are operated by one operator upon our streets and highways, many of them at high speed, where other traffic both pedestrian and vehicular presents an ever-present peril, it would seem that the limited operations contemplated by the small Diesel in question with a crew of four can cope with any exigencies which may arise and insure safety in operation without the requirement that the engine must at all times and under all circumstances be actually manned with a crew

of not less than one qualified engineer or operator and a helper.

Reference is made to the number of paths crossing the yards and the route traversed by the switch engine in the contemplated operation. Many, of course, have been made by trainmen in connection with their duties. Undoubtedly there are trespassers, and probably some licensees, who are crossing these tracks from time to time, but the evidence does not indicate that their presence presents a safety problem which requires a second man to assist in the manning of this Diesel engine at all times. Some testimony offered by the defendants would indicate that at times it would be inconvenient to give signals on the left-hand side, and in the event there was only the engineer in the cab, the switchman would have to cross the tracks to get on the engineer's side in order to transmit the proposed signal. Granted that there may be circumstances of this kind where it might be inconvenient if someone was not on the fireman's side of the engine to receive signals which might in turn be transmitted to the engineer, there is no suggestion that requiring the switchman to be on, or to cross over to the right side to give the required signal presents any safety problem, or that it substantially interferes with the practical operation of the particular switching movement. The City of Duluth is not concerned with the convenience of the switching operations in the yards in question, or whether the movements will proceed more expeditiously with an engine manned by two men. The only basis for the validity of this ordinance must be its relationship to the safety of the public and the employees. Not only is there an absence of a showing that the contemplated switch movement cannot be safely made with an engineer and three switchmen, but a fair appraisal of the entire situation strongly suggests that, not only would such operation with an engineer in the cab be entirely safe under all normal circumstances, but that the switching could be carried on with substantially the same degree of practicability and expedition as with two men manning the Diesel. If one bears in mind that there is, so to speak, complete control by the switch crew of the movements of the engine engaged in switching, the unreasonableness of the ordinance as framed seems patent. Moreover, there is an unqualified rule, which is carefully obeyed, that if at any time the

engineer loses sight of the signalman who is controlling the movements of the engine, the engineer immediately stops the train. Indeed, it appears from the evidence that the movements of the particular switching operation herein are largely routine; that is, the work of one shift is largely a repetition of the previous period. The same trains come in day after day with substantially the same number of coaches; they are taken up to the coach yard as indicated, and then moved from the coach yard down to the train tracks. All of the trainmen who are engaged in the switching operations are fully familiar with the surrounding conditions and the operation which is carried on is relatively simple and free from any extra-hazardous conditions. The only possible relation to safety of a helper on this small Diesel is to aid the engineer in observing ahead and to the side and to receive and relay signals. At times, his aid might be convenient, but during a large majority of the time the helper would be mere surplusage and the contribution to the safety of operation by his addition would be of but little consequence. In light of these circumstances, the proposed ordinance imposes an impractical and burdensome requirement on the movements in which the Diesel engine would be engaged.

Concededly, there is no situation in life which is absolutely safe. Safety at best is a relative term. But that dangers may be reduced to a minimum by the operation of this Diesel engine in the switching operations referred to, with an engineer and a crew of three, seems reasonably clear. There is always some danger in movements of any mechanical means of transportation. For instance, an automobile which passes another on the highway always incurs some dangers in this movement and many accidents happen during such passing, but to prohibit by statute or ordinance any car to pass another car on the street or highway at any time or under all circumstances would, of course, be highly unreasonable. The law recognizes, therefore, that passing may be permitted when conditions are such that it may be carried on with reasonable safety. At times, perhaps, it might be conducive to safety to have a second person seated with the driver of an automobile on our highways to aid in observing the road on snowy or foggy days or nights, but for that reason to require a second person in the front seat of an automobile at all times would be most unreasonable.

That plaintiff is properly in a court of equity is not seriously challenged. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764. Every day that the Diesel would be manned by only an engineer would, under the ordinance, constitute a separate offense. Each offense is punishable by a fine of $100 or by imprisonment for not exceeding 85 days. Moreover, that the Court is empowered to stay the enforcement of an ordinance which is unreasonable and oppressive as applied to certain conditions seems to have been settled by well-considered cases. The terms of the entire ordinance and its subject matter are inseparable and hence unenforcible as to the proposed movements of this Diesel. Evison v. Chicago, St. Paul, Mpls. & Omaha Ry. Co., 45 Minn. 370, 48 N.W. 6, 11 L.R.A. 434; State ex rel. Young v. Standard Oil Co., 111 Minn. 85, 126 N.W. 527; City of St. Paul v. St. Paul City Ry. Co., 114 Minn. 250, 130 N.W. 1108, 36 L.R.A.,N.S., 235, Ann.Cas.1912B 1136; Seaboard Airline Ry. Co. v. Blackwell, 244 U.S. 310,

I conclude, therefore, that the ordinance as applied to the limited Diesel operation, as referred to herein, imposes unusual, unnecessary, and arbitrary restrictions which bear no reasonable relation to the purposes for which the ordinance was enacted, and an order should be entered permanently restraining the defendants from enforcing said ordinance with reference to said proposed switching operations.

Findings of fact, conclusions of law and order for judgment in harmony herewith may be presented by the plaintiff upon five days' notice. An exception is allowed to the defendants.