INDUSTRIAL GRAPHICS, INCORPO-RATED, a Minnesota Corporation, and MGA, Inc., a Minnesota Corporation, Plaintiffs,

v.

ASAHI CORPORATION, a Japanese Corporation, Defendant.

Civ. No. 2–77–176.

United States District Court, D. Minnesota, Second Division.

Jan. 30, 1980.

Peter Etzell and Douglas E. Sinclair, Etzell & Sinclair, North Mankato, Minn., for plaintiffs.

Keith E. Goodwin and Edward M. Laine, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This is a breach of warranty action for damages brought by plaintiffs, two Minnesota corporations, which involves the purchase by plaintiff Industrial Graphics, Inc., of 4,000 defective 23 channel citizens band radios in 1976. The radios in question were manufactured by defendant Asahi Communications, Inc. and sold by Asahi to an intermediary, which in turn sold the radios to the plaintiffs. The Court, having considered all of the evidence presented at trial and all the arguments of counsel, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court has jurisdiction over the subject matter of this dispute under 28 U.S.C. § 1332.

*The Parties*

Plaintiff Industrial Graphics, Incorporated (hereinafter IGI) is a Minnesota corporation with its principal place of business in Mankato, Minnesota. IGI is a wholly owned subsidiary of plaintiff Mankato Graphic Arts, Inc. (hereinafter MGA), which is also a Minnesota corporation with its principal place of business in Mankato, Minnesota. Francis J. Murray is the chairman of the board and chief executive officer of MGA, as well as the president of IGI. During 1976, John (Jack) C. Daugherty functioned as the vice-president of operations for IGI. The defendant, Asahi Corporation (hereinafter Asahi) is a trading company organized under the law of Japan with its principal place of business in Tokyo, Japan, and at all relevant times was engaged in the export of electronic products. Asahi Communications, Inc. is engaged in the manufacturing of electronic products, including the radios which are the subject matter of this dispute.

IGI, beginning in 1974, became involved in marketing products for use in conjunction with motor vehicles, the market being known as the "automobile after market." IGI's product line during 1974–76 included walkie talkies, tape players, tape recorders, cruise controllers, pocket radios and portable radio phonographs. IGI marketed its products either through direct sales or through the efforts of its independent sales representatives who were located in various parts of the United States.

*The Transaction*

In late 1975, IGI decided to enter the then burgeoning wholesale market in citizen band radios (hereinafter CBs). In 1975, IGI contacted Foreign Trades Corporation (hereinafter FTC), a Minnesota corporation headquartered in Mankato which was engaged in brokering products imported from countries located in the Orient. The sole shareholder of FTC was Eugene J. Biedscheid, a Mankato resident. Biedscheid was also one of the principal owners of Bakco, Ltd. (hereinafter Bakco) which had offices in Hong Kong and Taiwan, and which was also engaged in importing and exporting goods. IGI's purpose in contacting FTC was to arrange for the purchase of CBs from a manufacturer in the Orient, as there were no domestic manufacturers of CBs willing to sell at competitive levels to independent wholesalers.

Biedscheid traveled to Japan on behalf of IGI to arrange for the purchase of CBs. Ultimately, Biedscheid negotiated with Ken Adachi of Asahi in Tokyo in 1975 for the sale of 23 channel CB radios to be marketed as the Fairmate AC–500 (hereinafter AC–500). Biedscheid and Adachi agreed that samples and specifications for the AC–500s would be sent to FTC in Minnesota. The specifications for the AC–500 were sent by Asahi to FTC in January of 1976. As Asahi was just beginning its efforts in manufacturing CBs, Ken Adachi could only promise Biedscheid that Asahi could produce 2,000 CBs per month, and that the first shipment could not be made until May of 1976. Although Asahi was aware that Biedscheid and his companies were engaged in a brokerage function and that the CBs would be resold, Asahi officials were not aware in early 1976 of the identity of IGI as the

ultimate purchaser. The price quoted to Bakco by Asahi was $50.30 per unit on a total order of 6,000 radios.

After Biedscheid presented the various alternatives as to possible manufacturers,[1] IGI decided to purchase 6,000 CBs from Asahi through FTC. IGI officials reached this decision in part because of Asahi's good reputation and in part with the purpose that a long term relationship as a purchaser of Asahi's electronic products could develop. On March 19, 1976, IGI sent a purchase order to Bakco, at Biedscheid's direction, for 6,000 AC–500 CBs at a price of $54.80 per unit. On March 23, 1976, this purchase order was amended to allow for later shipping dates. IGI thereafter entered into a written brokerage contract with FTC, and agreed to pay FTC a commission of $3.29 per unit on the 6,000 AC–500s. Unbeknownst to plaintiffs, Bakco received a "commission" as well on the difference between the $54.80 IGI purchase price and the $50.30 price quotation from Asahi to Bakco. This was accomplished through Bakco submitting its own purchase order to Asahi on April 7, 1976, for 6,000 AC–500s at a purchase price of $50.30 per unit. Asahi and Bakco entered into a "sales note" on April 16, 1976, which specified certain conditions of the sale.[2] Payment for the radios was accomplished through the use of a transferable letter of credit.

The only express representation[3] made by Asahi with respect to the quality of the CBs was that the radios would receive "type acceptance" from the Federal Communications Commission (FCC), which was necessary for the radios to be sold in the United States. FCC "type acceptance" for the AC–500 was received on May 26, 1976.

Prior to the time the CBs were actually shipped, IGI made a number of purchases in anticipation of its entry into the wholesale CB radio market. In the spring of 1976, IGI purchased 6,000 CB antennas from a third party for a total cost of $37,226.00 for resale along with its inventory of CBs, including the AC–500s. On April 30, 1976, MGA purchased Key City Communications, Inc. (hereinafter Key City), an ongoing business engaged in the repair and maintenance of electronic products, primarily CB radios, for the price of $60,000.00. IGI planned to use Key City for warranty and repair service for the purchasers of its radios. At the time Asahi entered into its contractual obligations for the sale of the 6,000 CBs, it had no actual knowledge of IGI's purchase of the antennas or Key City as a part of IGI's foray into the CB market.

After FCC type acceptance was obtained, Asahi shipped 500 of the 23 channel AC–500s to IGI about June 1, 1976, via air

---

1. IGI, prior to the time it received the initial shipment of radios from Asahi, had purchased a quantity of CB radios manufactured in Taiwan for resale, and had also purchased another brand of CB through a New York importer for resale.

2. Prior to trial, Asahi had argued that a provision on the back side of the sales note between Asahi and Bakco caused Japanese law to apply to this transaction. At trial, the defendant produced no proof on the issue of the content of the law of contracts of Japan, nor were affidavits on this issue tendered by Asahi. Under the circumstances, defendant has waived any contention that Japanese law applies to this transaction. Fed.R.Civ.P. 44.1. Moreover, Asahi offered no explanation for the "x" which crossed out the back side of the sales note, including the provision on the applicability of Japanese law. Under the circumstances, it cannot be said that Asahi and Bakco intended this provision to control their agreement.

3. After IGI issued its March 23, 1976, purchase order to Bakco, Asahi sent a sample of the not yet FCC approved AC–500 to FTC. As the purchase order was issued before the sample was received by IGI, it necessarily follows that the sample was not part of the "basis of the bargain" so as to render Minn.Stat. § 336.2–313(1)(c), which deals with express warranties and samples, operative. Moreover, as the AC–500 received FCC type acceptance, any express warranty made by Asahi was fulfilled. Consequently, Minn.Stat. § 336.2–313 is not applicable to the instant transaction. Similarly, Minn. Stat. § 336.2–315, which is concerned with implied warranties of fitness for a particular purpose, does not apply to the instant transaction because proof of the requisite reliance by IGI on Asahi's judgment and Asahi's knowledge of such reliance are absent. White & Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 9–9 at 297 (1972).

freight. The initial 500 radios were shipped by air rather than ocean freight because IGI perceived a high demand for the radios. IGI received the initial 500 radios by June 10th, and sold approximately 380 radios to mostly local customers by June 22, 1976. The next 3,500 radios were shipped by ocean freight, and were all received by IGI by approximately July 10, 1976.

On July 28, 1976, the FCC stunned the CB radio market by announcing that as of January 1, 1977, only 40 channel radios could be manufactured and that the sale of 23 channel radios would be banned. Although the FCC later revised this announcement to allow the sales of 23 channel units such as the AC–500 after January 1, 1977, the FCC's actions caused a rapid and dramatic decline in the wholesale and retail price of 23 channel radios during the latter part of 1976. By the time of the FCC announcement, IGI had sold 484 AC–500s. Due to the defects which developed in the AC–500s, as well as the marketing conditions, IGI refused to accept the last 2,000 of the 6,000 CBs sold by Asahi.[4]

*Quality Problems and Negotiations*

Beginning in early July of 1976, IGI became aware through customer complaints and returns of the AC–500s that the wattage output on a large number of the units was too low. Upon checking the wattage levels of various radios, IGI discovered that a significant number of the radios failed to possess an output of three watts, which was a generally acceptable minimum level. The low wattage output seriously affected the transmission capabilities of the AC–500, as the radios lacked the power to transmit the communications of the user a sufficient distance. In addition to the wattage problem, towards the end of July IGI also became aware of a problem with respect to the public address (PA) feature of the AC–500. Once an external speaker was connected to the PA jack on the rear of the AC–500s, all outgoing transmissions were broadcast over the external PA speaker, regardless of whether the PA switch was turned on or off by the user and regardless of which of the 23 channels were selected for transmission. The only way to transmit messages without the transmission also coming over the PA system was to disengage the PA jack from the back of the radio. Apart from these two significant problems, various other warranty repairs were made by IGI on the AC–500s during July of 1976.

Initially, IGI and Asahi attempted to cope with the wattage problems by Asahi forwarding instructions by telex through Eugene Biedscheid of FTC. Both IGI and Asahi made various proposals through FTC, all of which culminated in an August 15–16 meeting in Mankato between IGI officials Murray and Daugherty, Hirofaburo Kanoh of Asahi, and others. Prior to the meeting, IGI at one point had demanded that Asahi take back the goods for repair and while it is apparent that Asahi considered that proposal, it was not accepted. Rather, since taking back the units would have involved Japanese governmental approval and lengthy delays, Asahi's principal proposed solution was to send two of its own engineers to repair the units. Richard L. Schaak, chairman of the board and president of Schaak Electronics, Inc., a business engaged in the retail and wholesale aspects of electronic products, testified at trial that the normal industry response of the recipient of defective electronic goods was to either return the goods or have the manufacturer send technicians to repair the goods on the recipient's premises.

None of the telexes or communications between the parties or between Asahi and Biedscheid prior to the August 15th meeting mention quality problems other than wattage or the difficulties with the PA system. While other quality difficulties with the AC–500 were encountered prior to the August 15th meeting, the principal quality problems perceived by IGI officials with the AC–500 radios at that time were

4. IGI and Asahi, in the summer of 1976, entered into an agreement for the sale of an additional 6,000 CB radios. This agreement was not performed. As IGI received and paid for only 4,000 CBs, any damages to which it is entitled is limited to those damages arising solely from its purchase of the 4,000 AC–500s.

with the PA system and with the wattage output. At the August 15th meeting, after a discussion of the nature of the quality problems, Kanoh proposed that Asahi send its engineers to IGI to repair the units, or that Asahi take the units back for repair, although Kanoh indicated that the latter proposal was made reluctantly. Murray and Daugherty of IGI rejected both proposals, and in turn proposed that Asahi pay IGI $9 per unit to repair the CBs, which was consistent with a prior Key City estimate that it would cost $9 per unit "for checking, segregating and raising the watts on AC–500 Fairmates." Ultimately, Murray and Kanoh agreed that Asahi would pay IGI $1.50 per unit for repair, $1,100.00 to reprint instructional brochures [5] dealing with the PA feature to be inserted in the AC–500 package, and $1,760.87 for reimbursement of additional interest expense incurred by IGI through August 27, 1976. This agreement was reduced to writing on August 16th. The written agreement refers only to the PA system and wattage.[6] Asahi complied with the terms of the August 16th agreement in all respects, and paid IGI all amounts due under the agreement with respect to the 4,000 AC–500s. IGI, in accordance with the agreement, increased the wattage where necessary of the remaining units in its inventory.

In the latter part of August and in September of 1976, IGI became aware that the AC–500 CBs were still defective, as the radios ceased to function after being exposed to normal levels of shock and vibration after a short time of use. This vibration problem led to a failure rate of somewhere between 30% and 67% when the units were exposed to the normal levels of shock and vibration encountered by CBs in motor vehicles. The vibration and shock problems of the AC–500s ultimately led to a significant number of customers returning the AC–500s for repair or reimbursement.[7] Ultimately, IGI stopped actively marketing the AC–500 CBs, and sold its remaining inventory of approximately 3,200 units to two purchasers in May of 1977 at prices of $26.50 per unit (for 1,800 units) and $29.50 per unit (for 1,400 units). These sales were made without warranty and "as is." After its losses in the CB market became apparent, IGI sold its inventory of CB antennas, as well as Key City, and sustained further losses.

*Arguments of the Parties*

The basic position of the plaintiffs in this litigation is that defendant has breached an express or implied warranty and is liable for damages pursuant to Minn.Stat. § 336.-

---

**5.** As the defects in the PA system were not repairable from an economic standpoint, the parties agreed to inform consumers how to deal with the defects by disengaging the PA jack on the back of the AC–500.

**6.** The substance of the agreement provides as follows:

AGREEMENT BETWEEN
ASAHI CORPORATION & IG INCORPORATED
August 16, 1976

1. 3500 units in stock
 Interest thru August 27 1760.87
 September weekly reduction (1760.87)
 October weekly reduction ( 685.00)
 2445.87

2. 4000 units IG repair wattage [at] 1.50 each 6000.00

3. Reprint brochures, Rep. information & print a stuffer on P.A. operation 1100.00

 TOTAL 8860.87

4. 2000 units in Seattle (Asahi ship to IGI warehouse on open account & pays Asahi each week on units after initial 3500 units sold) Maximum time to be no later than month

following above 3500 units or November 30, 1976 for payment in full.

IGI repairs wattage at same rate $1.50 per unit
 3000.00
 11860.87
 Max. (2445.87) 14306.74
Asahi will send 6,000 instruction manuals printed on back IGI name, address and in bold print P.A. instructions.

Signed For Signed For
IG Incorporated Asahi Corporation

/s/ F. James Murray /s/ Mr. H. Kanoh

---

**7.** Ultimately, the Ramy Seed Co., which had purchased 120 AC–500s for use as premiums to their customers, returned the entire 120 radios and was fully reimbursed by IGI. The Ramy brothers indicated at trial that while there was no written commitment made to IGI, they had planned no purchasing perhaps 500 to 1,000 AC 500s from IGI. This additional purchase was never accomplished because of the serious defects in the AC 500 radios.

2–714 and § 336.2–715. More specifically, plaintiffs claim that they are entitled to breach of warranty damages under Minn. Stat. § 336.2–714(2) and (3), and either incidental or consequential damages under Minn.Stat. § 336.2–715 in the form of lost profits on the sale of the AC–500s, losses on the CB antennas, additional overhead expense and interest charges attributable to the AC–500s, losses sustained in the sale of Key City, and the loss of net profits on the projected sales on its other product lines. Plaintiffs claim they are entitled to damages from Asahi in the amount of $377,651.00.

Asahi's principal defense with respect to the issue of liability is that the agreement reached by IGI and Asahi on August 16, 1976, amounts to a complete accord and satisfaction and IGI is therefore barred from any further recovery. In addition, the defendant makes a number of arguments with respect to damages. First, Asahi contends that the plaintiffs are not entitled to consequential damages for "economic loss" under Minn.Stat. § 336.2–715 because of the absence of privity of contract. The defendant also claims that the losses sustained by IGI were caused by the declining 23 channel CB market in the fall of 1976 and are therefore not attributable to any breach of warranty. Further, Asahi argues that a significant amount of the damages claimed by plaintiff were caused by unreasonable decisions made by IGI, or were simply not foreseeable by Asahi.

*Breach of Warranty and Plaintiffs' Right to Recover Damages*

■ The Court has concluded that Minnesota law applies to this commercial transaction under Minn.Stat. § 336.1–105,[8] that under Minnesota law a seller's implied warranty of merchantability extends to a purchaser such as IGI despite the absence of privity of contract, and that Asahi breached an implied warranty of merchantability under Minn.Stat. § 336.2–314 because of the failure of the AC–500s to withstand normal shock and vibration levels.

■ Under the law of Minnesota, the implied warranty of a seller extends to any person who can reasonably be expected to use or be affected by the goods and is injured by the breach, irrespective of privity of contract. *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 357 (Minn.1977); *Milbank Mutual Ins. Co. v. Proksch*, 309 Minn. 106, 244 N.W.2d 105 (1976); *Beck v. Spindler*, 256 Minn. 543, 99 N.W.2d 670 (1959); Minn.Stat. § 336.2–318. As IGI purchased the goods in question for resale and was injured by the breach, IGI is certainly a third party beneficiary of Asahi's implied warranty of merchantability. There was ample evidence that the AC–500s sold by defendant were defective with respect to the PA feature, wattage output and the failure to withstand normal shock and vibration levels. The failure of the units to withstand normal levels of shock and vibration rendered the units unmerchantable, and amounted to a breach of implied warranty of merchantability under Minn.Stat. § 336.2–314 on the part of Asahi.

■ The legal effect of the August 16th agreement entered into by Asahi and IGI is of crucial importance to the issues of liability and damages. As noted, Asahi argues that the agreement amounts to an accord and satisfaction which completely bars IGI from any further recovery. Under Minnesota law, an accord and satisfaction:

acts to discharge a contract or a cause of action. It is itself an executed contract,

---

**8.** Minn.Stat. § 336.1–105(1) provides:

Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this chapter applies to transactions bearing an appropriate relation to this state.

As the radios were shipped into Minnesota to a Minnesota purchased, and Asahi was at least aware of the destination of the goods, and as Asahi cannnot now contend that Japanese law applies, the Court has concluded that the transaction here bears an appropriate relation to Minnesota, and thus Minnesota law applies. *See* footnote 2, *supra*.

and it may be expressed or implied from circumstances which clearly and unequivocally indicate the intention of the parties. * * * If the accord constitutes a binding contract and is fully performed, the original liability is discharged.

*Roaderick v. Lull Engineering Co., Inc.*, 296 Minn. 385, 389, 208 N.W.2d 761, 764 (1973)(citations omitted). *See also Shema v. Thorpe Bros.*, 240 Minn. 459, 62 N.W.2d 86 (1953). As the effect of an accord and satisfaction is dependent on the intentions of the parties, the "parties are concluded only as to matters actually included" in the settlement. *Held v. Keller*, 135 Minn. 192, 197, 160 N.W. 487, 490 (1916).

█ The Court has concluded that the August 16th agreement between the parties amounted to an accord and satisfaction only with respect to quality problems with the PA feature and the wattage output of the 4,000 AC–500s purchased by IGI. As the August 16th agreement was fully performed by Asahi, Asahi is discharged from all liability for damages sustained by IGI which resulted from the wattage and PA problems. *Roaderick v. Lull Engineering Co., Inc., supra.* However, the Court has also concluded that the parties, at least IGI, did not intend that the agreement entered into on August 16th would include matters other than the wattage and PA problems previously mentioned. Therefore, as the failure of the AC–500s to withstand normal shock and vibration levels amounts to a breach of implied warranty of merchantability on the part of Asahi which would not be precluded by the August 16th agreement, IGI is entitled to recover damages which flow from this particular breach.

Several reasons support the Court's decision that the August 16th agreement did not amount to a complete accord and satisfaction. First, the agreement itself only refers to the PA system and the repair of the wattage output. Second, none of the communications or telexes between the par-

ties or between Asahi and Biedscheid before the August 15th meeting refer to any quality problems other than the PA or wattage output level. While there had been some repair of the AC–500s on problems other than wattage prior to August 16th, it is plainly evident that IGI officials were not aware of the magnitude of the shock and vibration problems at the time IGI entered into the settlement agreement with respect to the PA and wattage problems. Although the shock and vibration problems were brought to the attention of Asahi by the Ramys at the August 15th meeting, it is clear that IGI officials, particularly Murray, did not enter into the agreement with the intent that the agreement encompass all quality problems. Asahi's argument that IGI was fully aware of all the quality problems and intended to fully settle all aspects of this dispute is further undermined by the failure of the parties to agree (or IGI to insist on) a more reasonable repair figure than the $1.50 per unit contemplated by the August 16th agreement.

*Damages Resulting From the Breach.*

1. Breach of Warranty damages.

The basic standard for breach of warranty damages is expressed in Minn.Stat. § 336.2–714(2):

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

*See Cambern v. Hubbling,* 307 Minn. 168, 238 N.W.2d 622 (1976). This statutory passage, by its terms, provides that the difference between the value of the goods as warranted and their value as accepted should be measured "at the time and place of acceptance." of the goods by the buyer.[9]

9. Asahi argues that the decline in price of 23 channel CBs during the latter part of 1976 amounts to "special circumstances" within the meaning of Minn.Stat. § 336.2–714(2), and that the Court should therefore apply a less rigorous

measure of damages. The Court disagrees, as the traditional measure of damages for breach of warranty embodied in Minn.Stat. § 336.2–714(1), the difference at the time and place of acceptance between the value of the goods as

As the 4,000 AC–500s were delivered to IGI in Minnesota at various stages in June and early July of 1976, the difference in value between the goods as accepted and their value if they had been as warranted must be measured as of this time.

The landed cost to IGI, which includes the purchase price of $54.80, the broker's fee of $3.29 per unit, and freight charges, amounted to approximately $250,-000.00, or $62.50 per unit. This figure is an appropriate index of the value at the time and place of acceptance of the AC–500s had they been as warranted. IGI sold a total of 632 AC–500s at a purchase price higher than its landed cost of $62.50 per unit. The Ramy Seed Co., which purchased 120 of the 632 AC–500s, returned these 120 units and was either credited by IGI or fully reimbursed in cash, thus leaving a total of 512 AC–500s sold at a price higher than IGI's landed cost. As the plaintiffs cannot recover damages in excess of the actual injury sustained, IGI is limited to the recovery of damages for 3,488 AC–500s, as it not only received the difference in value between the goods as warranted and as accepted, but a profit as well on the 512 units sold at higher than the $62.50 per unit landed cost. *E. H. Boerth Co. v. LAD Properties*, 82 F.R.D. 635, 646 (D.Minn.1979); *Clements Auto Co. v. Service Bureau Corp.*, 298 F.Supp. 115 (D.Minn.1969), *rev'd in part on other grounds*, 444 F.2d 169 (8th Cir. 1971).

Under Minn.Stat. § 336.2–714(2), the cost of repair, if the repair would restore the goods to the value which they would have had if the goods had been as warranted, is a reliable measure of damages. *Soo Line Railroad Co. v. Fruehauf*

*Corp.*, 547 F.2d 1365 (8th Cir. 1977); *Tarter v. MonArk Boat Co.*, 430 F.Supp. 1290 (E.D. Mo.1977). In this case, neither party offered any estimate as to what it would cost to repair the AC–500s for the vibration and shock defects. While the defendant points out that the $9 repair figure offered by plaintiffs may be a reasonable cost of repair, that $9 figure stems from an estimate of what it would cost to upgrade the wattage levels, rather than what it would cost to repair the radios so that they could withstand the normal levels of shock and vibration. Although this $9 figure is an indication of plaintiffs' damage, it is not in itself an adequate measure.

After unsuccessfully attempting to sell its inventory of AC–500s in 1976 and early 1977, IGI ultimately sold the bulk of its remaining defective inventory in May of 1977 at prices of $26.50 per unit and $29.50 per unit. After the FCC July 28th announcement, the wholesale and retail prices of 23 channel radios plummeted in August and September by 40% to 50%, and then leveled off. Conversely, before the market was propelled into disarray by the FCC announcement, prices were relatively stable, although the supply of 23 channel CBs was gradually catching up with demand. Based on the nature of the 23 channel CB market before July 28th, the $9 per unit repair figure for wattage adjustment, and the serious nature of the vibration and shock defects of the AC–500s, the Court has determined that the value of the AC–500s in June or July of 1976 in Minnesota was $47.50 per unit. This figure is a reasonable approximation of the value of the AC–500s as accepted in June and mid-July of 1976.[10]

warranted and as accepted, does not contemplate that subsequent changes in market conditions renders its formula inapplicable. In *Alafoss, h.f. v. Premium Corp. of America, Inc.*, 599 F.2d 232 (8th Cir. 1979), the Eight Circuit found that special circumstances showed damages of a different amount because the buyer of the defective goods had an expectation at the time of entering the agreement that a significant percentage of inventory would not be sold. That case is clearly distinguishable, as IGI had no such expectation here. In the instant case, only changing market conditions had an impact

on future sales. No such "special circumstances" are present here which would justify a deviation from the traditional standard of Minn.Stat. § 336.2–714(2).

10. The plaintiffs' argument with respect to breach of warranty damages has little merit. On the one hand, they argue that IGI should recover the actual losses it sustained on the AC–500s by a formula which amounts to the difference between the total of the landed cost of the radios and its net sales. This formula is deficient in a number of respects. First of all, it allows IGI credit for sales on the 512 units

*Faust v. Parrott*, 270 N.W.2d 117 (Minn. 1978); *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 211 N.W.2d 159 (1973). As plaintiffs can only recover breach of warranty damages for injury which resulted from the failure of the AC–500s to withstand normal levels of shock and vibration, the $9 per unit estimate to correct the wattage level (as originally proposed by Key City) is somewhat relevant. There is no reasonable dispute that the shock and vibrational problems, which were due in part to inadequate design, wiring and possibly components, was a more serious quality problem than that presented by the wattage adjustment. Consequently, it is reasonable to assume that it would take more time, and therefore a higher cost to repair the units than the previously noted $9 figure. Moreover, as the market for 23 channel radios had not yet been disrupted in June and mid-July of 1976, the radios were clearly worth much more than the $26.50 per unit and $29.50 per unit prices received in May of 1977. All things considered, the figure of $47.50 per unit is a reasonable approximation of the value of the AC–500s as accepted by IGI.

Thus, as the difference between $62.50 per unit and $47.50 per unit amounts to $15.00 per unit, the proper amount of damages to be awarded IGI under Minn.Stat. § 336.2–714(2) is $52,320.00 (3,488 units x $15 per unit).

### 2. Consequential Damages Under Minn. Stat. § 336.2–714(3) and Minn.Stat. § 336.2–715(2).

■ Consequential damages under Minn.Stat. § 336.2–715(2) are properly awardable in a breach of warranty case where the plaintiff establishes to a reasonable certainty that it is entitled to a specific amount of consequential damages. *Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824 (Minn. 1977); *Bemidji Sales Barn v. Chatfield*, 250 N.W.2d 185 (Minn.1977); *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 211 N.W.2d 159 (1973). The buyer's right to recover consequential damages is articulated in Minn.Stat. § 336.2–715(2), which provides:

Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

As noted, plaintiffs claim that they are entitled to consequential damages for lost profits on the AC–500s, for losses sustained on the sale of the CB antennas purchased from a third party, for losses sustained on the sale of Key City, and for lost profits on the projected sales of its other product lines.

### A. Privity of Contract

■ At the outset, Asahi argues that as the claimed items are all aspects of "economic loss," these items of damage are not properly recoverable in the breach of implied warranty of merchantability context because there is no privity of contract between Asahi and IGI. *See State ex rel. Western Seed Production Corp. v. Campbell*, 250 Or. 262, 442 P.2d 215 (1968), *cert. denied*, 393 U.S. 1093, 89 S.Ct. 862, 21 L.Ed.2d 784 (1969); White & Summers, *Handbook of the Law Under the Uniform*

for which it has already received its landed cost plus a profit, thus amounting to an impermissible duplicative recovery. Second, the formula advanced utterly ignores the values of the radios at the time and place of acceptance, as the net sales extend all the way into May of 1977, when the units were affected by declining market conditions.

On the other hand, plaintiffs argue that the difference in value between the goods as war-

ranted and as accepted would require a finding that 69% of the units, the failure rate advocated by plaintiffs, have no value whatsoever. This argument clearly ignores the fact that plaintiffs sold their remaining inventory in May of 1977, well after the time of acceptance, at $26.50 and $29.50 per unit, and that plaintiffs made periodic sales of the AC–500s at prices higher than the landed cost figure throughout 1976 and early 1977.

*Commercial Code*, § 11–5 at 333–35 (1972). It cannot be said that under the circumstances IGI and Asahi are in privity of contract, as there was no agreement between them. *See* Minn.Stat. §§ 336.1–201(11); 336.1–201(3). The Minnesota Supreme Court has not determined the issue of whether a purchaser of a product who is not in privity of contract with the defendant can recover consequential damages for economic loss under Minn.Stat. § 336.2–715(2) where no personal injury is present and upon proof of a breach of implied warranty of merchantability. Other jurisdictions are in disagreement over this issue, and the basis for denying recovery of such damages is apparently a concern over unforeseen use of the goods by the remote buyer or a concern that the seller cannot adequately insure itself for such losses. *See* White & Summers, *Handbook of the Law Under the Uniform Commercial Code, supra.* This Court has concluded that the Minnesota Supreme Court under these circumstances would decide that where, as here, a purchaser buys defective goods for resale and sustains solely economic loss as a result of a breach of implied warranty of merchantability, the buyer is not precluded from recovering consequential damages for economic loss simply because the purchaser is not in privity of contract with the defendant seller. *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873 (1958); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977).

There are a number of significant reasons which support the Court's conclusion that economic loss, including lost profits, should be recoverable in a breach of implied warranty case where no personal injuries are involved and where no privity of contract exists. First, it is unfair and inconsistent to allow a plaintiff who sustains personal injuries to recover from a remote defendant while not allowing recovery to those who suffer only economic loss. Minnesota allows a consumer who sustains personal injuries from a defective product to recover from a party with whom he is not in privity

of contract under both a strict liability or breach of warranty theory. *McCormack v. Hankscraft Co., Inc.*, 278 Minn. 322, 154 N.W.2d 488 (1967). Even those jurisdictions barring recovery of lost profits from one not in privity for the most part follow such a rule. Second, and somewhat related to the preceding reason, is that economic loss can be as devastating as injury to one's person. *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (Peters, J., dissenting). Third, not allowing such recovery could theoretically encourage manufacturers to utilize thinly capitalized intermediary corporations to sell defective products, thereby escaping liability. *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977). Fourth, the rule barring such recovery from non-privity defendants plainly encourages multiple litigation, thereby undermining judicial resources. Fifth, and perhaps most important, is that the fears underlying the decisions barring such recovery about unforeseen and unlimited liability are illusory, as the Uniform Commercial Code offers ample protection to manufacturers and other sellers. *Id.*; *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976). In this regard, the UCC allows manufacturers to restrict their liability by exclusion and modification of implied warranties, and the provisions creating implied warranties are carefully tailored. Also, and quite importantly, with respect to the recovery of lost profits, the Code allows recovery only if the loss was foreseeable by the seller. *See* Minn.Stat. § 336.2–715(2)(a). Finally, the Minnesota cases, while they have not addressed the precise issue presented here, have continually rejected the artificial notion that privity of contract should bar recovery. *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn.1978); *Milbank Mutual Ins. Co. v. Proksch*, 309 Minn. 106, 244 N.W.2d 105 (1976); *Beck v. Spindler*, 256 Minn. 543, 99 N.W.2d 670 (1959) (privity not a bar to recovery of warranty damages for economic loss in a pre-Code context).

### B. Lost Profits on the AC–500s

While IGI is not precluded from recovery for consequential damages because

of the lack of the privity, it was incumbent upon plaintiffs to prove to a reasonable certainty that they are entitled to such damages, including that the damages sustained were the result of the breach. *Leoni v. Bemis Co., Inc.,* 255 N.W.2d 824 (Minn. 1977); *Bemidji Sales Barn v. Chatfield,* 250 N.W.2d 185 (Minn.1977). In this case, plaintiffs' burden is complicated further by the partial accord and satisfaction which resulted from the August 16th agreement and the indisputable fact that wholesale and resale prices in the 23 channel CB radio market dropped dramatically after the July 28, 1976, FCC announcement approving 40 channel radios. The uncontroverted evidence at trial [11] established that prices for 23 channel units dropped almost immediately at both the wholesale and retail levels after the July 28th announcement and that the prices declined to a point where at the end of September of 1976, the prices had dropped to approximately 40% to 50% of the pre-July 28th levels. At the time of the July 28th announcement, IGI had only sold 484 of the AC–500s, although 4,000 had been delivered by mid-July. Two of the reasons for the pre-July 28th slow sales were undoubtedly the PA and wattage problems which developed early on with the AC–500s. However, all liability of Asahi with respect to the PA and wattage problems was discharged by virtue of the August 16th agreement. Thus, as plaintiffs have the burden to establish that any consequential loss was caused by the breach, the plaintiffs' damages for lost profits are limited to those sales which could have been made at a profit prior to the decline in the price of 23 channel units which were not consummated because of the breach, i. e., the failure of the radios to withstand normal vibration and shock levels.

The average actual sales price of the AC–500s prior to July 28th was $85.63. Most of these sales were entered into directly by IGI without the assistance of its distributors, who normally received a 10% commission. After the July 28th announcement, prices dropped at the rate of approximately 5% per week until the end of September (which would amount to a 45% to 50% decline in price).[12] Thus, given this 5% per week decline and the average sale price of $85.63, the date at which the AC–500s would have declined in price to $62.50 per unit (IGI's landed cost) because of market conditions would have been approximately the end of the first week of September, 1976 (5½ weeks).

In order to establish that they are entitled to lost profits, it was incumbent upon the plaintiffs to prove that they would have sold a certain amount of AC–500s by the end of the first week of September but for the breach. Moreover, for sales which would have been made but for the breach and which were handled by its distributors, IGI, by virtue of its commission arrangements (a commission of 10% was normally paid to its distributor upon a sale), would have had to sell the units by approximately August 25th in order to realize a profit.

Prior to August 16, 1976, IGI officials did not realize the pervasive magnitude of the vibration and shock problems. Up to that time, the quality problems which had be-

---

**11.** Richard Schaak of Schaak Electronics testified to the price developments in the 23 channel CB market during 1976. Plaintiffs offered no expert testimony on the state of the CB market in 1976. Mr. Schaak's opinions concerning the rapid decline in prices were fully corroborated by numerous admissions made on the part of IGI officials concerning the "softness" of the CB market and their inability to compete in the late summer and fall of 1976 at profitable levels due to the falling prices.

During the course of the trial, the Court reserved ruling on the admissibility of newspaper articles offered by defendant which comment on the condition of the CB radio market in 1976. The Court has concluded that these exhibits (D–7 through D–14) are inadmissible because the exhibits constitute hearsay. Therefore, these exhibits are not received and were not considered by the Court in reaching its decision.

**12.** Richard Schaak, defendant's expert, testified that prices in the 23 channel market declined gradually during August and September of 1976 so that by the end of September, approximately nine weeks after the July 28th FCC announcement, the prices were 40% to 50% of the pre-July 28th price levels. This amounts to approximately a 5% per week decline in price.

come known by IGI were only the PA and wattage problems. If IGI officials were not aware of the vibration and shock problems, it seems very unlikely that its distributors became aware of the shock and vibration problems by the end of August to the extent that it influenced their sales efforts in a negative manner. Thus, the Court can only conclude that as the sales efforts of the IGI distributors could not have been influenced by the shock and vibration problems by the end of August, IGI is not entitled to any lost profits on sales it distributors would have made but for the breach, as it cannot be said that any lost profits on such sales were the result of the breach. Similarly, as the consumer public could not have been aware of the failure rate of the AC–500s by the first week of September (as IGI officials had, according to their testimony, only become aware of such defects towards the end of August and beginning of September), the sales of the radios, particularly in light of the retail bargains during this time, could not reasonably have been influenced by this lack of knowledge. Consequently, the Court has concluded that IGI has failed to meet its burden of proof to show that it is entitled to lost profits on AC–500s which it might have sold itself to the general public.

However, the above analysis is not necessarily controlling with respect to those pre-July 28th purchasers of the AC–500s. The Ramy Seed Company, a Mankato concern, purchased 120 AC–500s on June 22nd and suffered through the problems with the wattage levels and the PA system along with IGI and its other customers. However, the Ramy brothers were aware by the middle of August of some problems concerning shock and vibration as they both indicated to Kanoh of Asahi at the August 15th meeting that there may be a problem in this regard with the AC–500s after a period of time. Presumably, other customers who purchased significant quantities of AC–500s prior to July 28th were also aware by the middle of August that the units failed to withstand normal levels of shock and vibration after a period of use.[13] The Ramys both testified at trial that they anticipated purchasing up to 1,000 AC–500s for use as premiums in the marketing of seed. The Auto Miles Warehouse in Minneapolis purchased 80 units each on three different occasions in June, July and in early August, for a total of 240 units, and undoubtedly encountered the same quality problems as did the Ramy Seed Co.

Based on the knowledge of the defects possessed by IGI's pre-July 28th purchasers, the pre-September 1st pattern of sales, and the expectations expressed by some of its purchasers, the Court has concluded that IGI would have sold without the assistance of its distributors an additional 250 AC–500s were it not for the breach of warranty by the end of the first week of September at an average price of $78.90, the purchase price of the units originally sold to the Ramy Seed Co.[14] Furthermore, IGI is entitled to lost profits on the units sold and later returned to IGI because of the shock and vibration defects. The evidence disclosed that 120 of the units were so returned by the Ramy Seed Co., which, as noted, purchased the units at the price of $78.90 per unit. Thus, IGI is entitled to

13. The fact that the Ramy brothers, and presumably others, may have been aware by the middle of August of a problem concerning shock and vibration in no way alters the Court's conclusion that IGI did not enter into the agreement of August 16 with the intent that such problems were included within the settlement contained in that agreement.

14. The foregoing analysis only considers the units which would have been sold by early September but were not because of the failure of the radios to withstand normal levels of shock and vibration. The Court's conclusion does not include units which would have been sold by such a date but were not because of the PA and wattage quality problems, because Asahi is discharged from liability under the August 16th agreement for any damages which are attributable to the PA and wattage problems. While the Court does not accept Asahi's argument that IGI's refusal of Asahi's August offer to repair the units was so unreasonable at the time that it should preclude the recovery of damages, it should be noted that it is not the function of this Court to relieve the plaintiffs from what in hindsight appears to be a bad bargain.

profits it failed to realize on 370 units based on a purchase price of $78.90 per unit. Consequently, the plaintiffs are entitled to a total amount of $6,068.00 (370 units x the difference between $78.90 and $62.50) for the profits they failed to realize on the purchase and sale of the AC–500s because of the breach.

C. Losses on IGI's Sale of the CB Antennas and Key City Communications, Inc.

■■■ As noted, consequential damages must result "from the seller's breach . . . ." Minn.Stat. § 336.2–715(2). *Bemidji Sales Barn v. Chatfield*, 250 N.W.2d 185 (Minn. 1977). Furthermore, such losses must be those which the "seller at the time of contracting had reason to know . . . ." Minn.Stat. § 336.2–715(2)(a). There is no evidence which infers that Asahi, at the time it entered into the sales agreement with Bakco, had actual knowledge or reasonably should have known that an unknown ultimate purchaser had bought antennas or an independent business as a retail or repair outlet for use in conjunction with contemplated sales of the AC–500s.

The antennas purchased by IGI, as well as Key City, were not usable only in connection with the AC–500s but could very well have been used or sold with other CBs. Further, any losses on these items cannot be causally divorced from the declining 23 channel market after the FCC announcement.

In light of the tenuous connection between the losses sustained on the sale of Key City and the sale of the antennas and the breach, as well as the lack of reasonable foreseeability of these losses on the part of Asahi, the Court has determined that such losses are not recoverable by plaintiffs.

D. Lost Profits on the Sale of Other Product Lines

■■■ Plaintiffs have also claimed that they are entitled to recover for the loss of business reputation through the loss of profits on the projected sales of other product lines as a result of the breach. IGI, as noted, began marketing products on a somewhat small scale in the automotive after market in 1974. Although Minnesota has no per se rule against the recovery of lost profits by an unestablished business, it must be shown to a reasonable certainty that such a loss did occur. *Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824 (Minn.1977). As noted in *Leoni*, the general rule in Minnesota that lost profits in a new business is too speculative for recovery derives from the proposition that because no history of profit is normally available, "new businesses rarely have evidence upon which an award of damages may be based with the requisite degree of certainty." *Id.* at 826 *citing Village of Elbow Lake v. Otter Tail Power Co.*, 281 Minn. 43, 160 N.W.2d 571 (1968); McCormick, *Damages*, § 29, p. 107. In 1974, in its first year of marketing its products, IGI incurred an approximate $6,000 loss. In 1975, IGI's operations netted a $10,000 profit. Although IGI lost approximately $2,000 in 1976 (the loss of the AC–500s being reported as an extraordinary loss in 1977), much of its sales effort in 1976 concentrated on the CB market. In subsequent years, IGI basically broke even on its operations and ultimately became defunct. Based on the assumptions that the sales of the other product lines would increase at the rate of 20% per year, that net profitability would amount to 9% on the other product lines, and that its marketing system sustained damage as a result of the breach, the plaintiffs argue that they are entitled to $102,886.00 for loss of profits on IGI's other product lines as consequential damages.

The Court has concluded that the claimed lost profits on IGI's other product lines are not recoverable because such losses are too speculative and were not caused by the breach.[15] *See Faust v. Parrott*, 270 N.W.2d

---

**15.** While plaintiffs claim that such losses are properly considered as injury to property and thus within Minn.Stat. § 336.2–715(2)(b), the Court cannot agree. This provision, which allows consequential damages to be recovered for injury to "property proximately resulting

117 (Minn.1978); *Leoni v. Bemis Co., Inc.,* 255 N.W.2d 824 (Minn.1977). First of all, in light of the lack of history as to profit and loss, the assumptions made in IGI's argument are simply unfounded and speculative. Moreover, the declining 23 channel CB market in 1976, as well as the wattage and PA problems for which Asahi is no longer responsible, undermines the plaintiffs' claim that the claimed losses were attributable to the breach.

3. Plaintiffs' Claims for Incidental Damages Under Minn.Stat. § 336.2–715(1).

■■ The plaintiffs' claims for damages for additional overhead expense and for additional interest expense as a result of the breach are properly considered as incidental damages under Minn.Stat. § 336.2–715(1), which provides:

Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

Financing costs and overhead expense which relate to the AC–500s are not recoverable in total because such expenses would have been incurred by IGI even if the AC–500s had been as warranted. Rather, such losses would be recoverable under Minn. Stat. § 336.2–715(1) only to the extent that such losses would not have been incurred except for the breach, i. e., the failure of the units to withstand normal levels of shock and vibration. Plaintiffs have claimed that they are entitled to $55,567.00 as compensation for financing expense and $17,909 as additional overhead expense incurred as a result of the breach. In the August 16th agreement, Asahi agreed to compensate IGI for the additional interest expense which IGI had incurred through August 27th because of the wattage and PA quality problems.

■■ The plaintiffs' claims must again be evaluated in the context of the declining 23 channel CB market in the late summer and fall of 1976, as well as in the context of the plaintiffs' own reactions to the crumbling market and the defects in the AC–500s. In Minnesota, under the doctrine of avoidable consequences, the damages recoverable are limited to the extent that the non-breaching party acts reasonably to prevent its own loss once the legal wrong has occurred. *Bemidji Sales Barn v. Chatfield,* 250 N.W.2d 185 (Minn.1977). In the midst of a crumbling market for 23 channel units, IGI attempted to sell the defective units through its distributors and ultimately through advertisements in the Wall Street Journal on two occasions.[16] Both advertisements were primarily directed to the whole-

from any breach," does not contain a foreseeability requirement. While the import of plaintiffs' argument has no bearing on the Court's conclusion, it seems clear that this statutory provision applies to physical damage to tangible property, and not lost profits. White & Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 11–7 at 338 (1972). Plaintiffs' claimed losses are thus properly considered as consequential damages under Minn.Stat. § 336.2–715(2)(a).

16. The two advertisements appeared on August 16, 1976, and April 4, 1977, respectively. In the first ad, IGI specified that the price was "[u]nder $82.00" per unit where "case lots of 10" were purchased. As of August 16th or shortly thereafter, the wholesale market for 23 channel radios had probably dropped 15 to 20% since IGI purchased the radios for $62.50 in July. For example, in an August 16th letter,

Jack Daugherty of IGI indicated that because the "majors" were offering their radios at lower prices than IGI's price for the AC–500s, IGI could not compete. In an October 4th letter to Asahi, Daugherty indicated that dealers were paying less than $30 per unit for radios comparable to the AC–500s. In the ad placed in April of 1977, IGI offered 3,500 units in bulk with a warranty for $50 per unit. One month later, IGI sold the remainder of its inventory as is at prices of $26.50 per unit and $29.50 per unit. During this one month period, it is highly doubtful that the market price declined substantially. These two national advertisements, clearly directed to the wholesale market, were IGI's principal marketing efforts after they realized that quality problems and a declining market were extant. The prices offered by IGI in their principal marketing efforts were simply out of tune with market conditions at the time.

sale market, and both ads stated prices which can only be considered unreasonable in light of the prevailing wholesale market conditions at the time the ads appeared. No significant sales developed from the ads. Although IGI sold units at greater than its landed cost after the FCC announcement, IGI sold less than 200 units near such a price in the nine months following the FCC announcement. The unreasonable adherence to high pricing decisions throughout the time the 23 channel market was disintegrating was in large part the cause of the delay which in turn contributed to the increased overhead and interest expense.

 Again, based on the quality problems with the PA and wattage level for which Asahi is no longer responsible, the declining prices in the 23 channel CB market, and the unreasonable pricing decisions made by the plaintiffs in reaction to the market, the Court has concluded that these were the principal factors attributable to the additional delay which in turn led to an increase in overhead and interest expense. Thus, plaintiffs have failed to sustain their burden of establishing to a reasonable certainty that the claimed losses were caused by the breach.

*Conclusion*

Plaintiffs are entitled to recover the total sum of $58,388.00 from defendant because of defendant's breach of implied warranty of merchantability.

LET JUDGMENT BE ENTERED ACCORDINGLY.