# NORTHERN NATIONAL BANK OF BEMIDJI v. NORTHERN MINNESOTA NATIONAL BANK OF DULUTH AND OTHERS.[1]

March 25, 1955.

No. 36,311.

---

[1]Reported in 70 N. W. (2d) 118.

*Richard E. Kyle, B. C. Hart,* and *George L. Bargen,* for appellant.

*Arthur R. Smythe,* for respondents Standard Oil Company and Claude Asp.

*Herbert E. Olson,* County Attorney, for respondent County of Beltrami.

*George E. MacKinnon,* United States Attorney, and *Clifford F. Hansen* and *Kenneth G. Owens,* Assistant United States Attorneys, for respondent United States.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, for the State.

FRANK T. GALLAGHER, JUSTICE:

Appeal from a judgment in favor of defendants.

It appears from the record that on December 1, 1949, Lakehead Pipe Line Company, Inc., referred to hereinafter as Lakehead, entered into a contract with Anderson Brothers Corporation, referred to hereinafter as Anderson. This contract essentially was one whereby Anderson agreed with Lakehead to build a pipe line across the northern part of Minnesota. The contract provides, among other things, that Anderson shall be responsible for all materials and finished work to the full amount of payment made thereon and will be required to make good, without additional cost to Lakehead, any injury or damage which the materials or work may sustain from any cause before final acceptance by Lakehead, with certain exceptions. It further provides that, when the final estimate has been accepted by Lake-

head and the time for filing liens in connection with such work has expired, Lakehead shall pay Anderson the remaining amount due within ten days, with certain optional provisions with reference to earlier payments without releasing Anderson or his bond from liability during the lien period. It also provides that, during the performance of the work, Anderson shall comply with all applicable laws, rules, and regulations of any board, commission, or regulatory body. Anderson further agreed to accept full and exclusive liability for the payment of any and all contributions and taxes for unemployment compensation insurance, old age pensions, and annuities imposed by any federal or state government which are imposed with respect to or measured by wages, salaries, et cetera, paid to employees and to indemnify and save Lakehead harmless against liability. Anderson also agreed to meet requirements specified under the rules and regulations of the administrative officials or boards charged with the enforcement of state and federal acts in the matter.

On February 28, 1950, Anderson entered into a contract with Gordon Braid, Philip LeBrun, and Joe D. McKinnon, referred to hereinafter as the partnership. This contract essentially was one under which the partnership agreed to clear the right of way for the laying of pipe and to do the backfilling after the pipe had been laid. The contract provided in part:

"Payments shall be made to SUBCONTRACTORS [the partnership] as of the First (1st) and Fifteenth (15th) day of each month for all of SUBCONTRACTORS operations * * *. SUBCONTRACTORS shall receive Eighty-Five (85%) Percent of the total statements submitted. The balance of Fifteen (15%) Percent to be withheld by ANDERSON as retainage and to be paid by ANDERSON to SUBCONTRACTORS upon receipt by ANDERSON of its retainage from PIPELINE COMPANY. In addition, ANDERSON shall withhold the payment of said retainage until SUBCONTRACTORS furnish proof satisfactory to ANDERSON that all claims for damages of any kind or character and for labor, equipment, material and supplies which SUBCONTRACTORS are required to furnish hereunder have been paid, settled and satisfied by SUBCONTRACTORS.

"* * * ANDERSON is hereby authorized to retain in its hands until the final disposition of all claims which may be made against it and/or SUBCONTRACTORS and for which SUBCONTRACTORS are or are claimed to be liable hereunder, a sufficient portion of the contract price to protect the company for and against all and any such claims and from any loss, costs, liability, damage or expenses arising therefrom or in connection therewith.

* * * * *

"SUBCONTRACTORS further agree to obtain at their own cost all permits and licenses necessary to do business in the States of North Dakota, Minnesota and Wisconsin, and to accept full and exclusive liability for the payment of any and all contributions or taxes for employment insurance, old age retirement benefits, income taxes, pensions or annuities, now or hereafter imposed by the Government of the United States and/or by the States of North Dakota, Minnesota and Wisconsin, which are measured by the wages, salaries or other compensation paid to the employees of SUBCONTRACTORS for work performed under the terms of this Agreement.

"The parties further agree that all the terms, provisions and agreements contained in the ANDERSON-PIPELINE COMPANY's Contract, together with all of its exhibits, documents, plans, specifications, general conditions and clauses are part and parcel of this Agreement and that SUBCONTRACTORS are completely subject to the contract between ANDERSON and the PIPELINE COMPANY. That it is not the intention of this contract to in any manner minimize or require less of SUBCONTRACTORS in their service to ANDERSON than is required of ANDERSON in its service to the PIPELINE COMPANY. That if there is any variance in this contract with the PIPELINE COMPANY's Contract that the purpose of this variance is to increase SUBCONTRACTORS obligations to ANDERSON over and above ANDERSON's obligations to the PIPELINE COMPANY."

According to the testimony of John A. Forester, vice president and cashier of plaintiff bank at the time the transactions involved in this lawsuit took place, he met Braid and LeBrun for the first time in the early part of 1950, but he had known McKinnon for a

number of years. After Braid got into the partnership, it opened an account with plaintiff bank, and shortly afterward the partnership asked the bank for a line of credit. That request was granted, and by July 1, 1950, the partnership owed the bank $25,000 for advances and approximately $40,000 on checks which were held as cash.

On July 22, 1950, the partnership sold, assigned, transferred, and set over to plaintiff bank all sums of money then due or to become due under its contract with Anderson. This assignment included all estimates, invoices, orders, or other instruments evidencing payments due or to be made under the contract and also all amounts retained by Anderson as retainage. On July 31 the above assignment was accepted by Anderson, who agreed to pay directly to plaintiff bank any and all moneys then due and payable or to become due the partnership, including any and all amounts held by Anderson as retainage under the terms of their contract with the partnership. On the date of the assignment to plaintiff bank, the total indebtedness of the partnership to the bank was $77,000. This amount was made up of $25,000 in notes and approximately $52,000 in cash items of unpaid checks. On December 31, 1950, the total indebtedness of the partnership to the bank had grown to $255,000.

The work under the contract between the partnership and Anderson was completed about January 5, 1951. About this time a dispute arose between the partnership and Anderson over the amount due under the contract, and on January 25, 1951, the partnership filed a lien against the pipe line. This lien was assigned to plaintiff bank on February 3, 1951, and was filed with the secretary of state of Minnesota on February 27, 1951.

An action to foreclose the mechanic's lien was commenced in Hubbard county district court and then transferred to the United States district court. However, that action was dismissed pursuant to a stipulation by which it was agreed that the amount due and unpaid on the contract between Anderson and the partnership was $160,000. It was further agreed under that stipulation that Anderson would pay plaintiff the sum of $160,000. However, $40,000 of that amount was to be placed in escrow with Northern Minnesota

National Bank of Duluth. The stipulation further provided that the $40,000 should remain in escrow and be released and disbursed in the following manner:

"It may be disbursed pursuant to a final judgment of a court of competent jurisdiction in a proceeding determining ownership of said monies or the relative priorities of the various claimants thereto, provided that all of said claimants are made parties to such proceeding."

Plaintiff bank then brought this action to determine the ownership of the $40,000 against defendants. The claims with respect to the various defendants are as follows:

(1) The claim of the United States of America is based upon its determination that as of April 14, 1953, there was due from the partnership the sum of $29,993.33, which sum includes all taxes, interest, penalties, and other items due as taxes or as a result of the failure of the partnership to pay the same promptly.

(2) The state of Minnesota claims a part of the amount due the United States government in the sum of $3,780.67 as liability for the payment of contributions of the Minnesota unemployment compensation fund.

(3) The claim of Beltrami county is for personal property taxes of the partnership due for the years 1950 and 1951.

(4) The claims of Standard Oil Company are based upon purchases of oils, gasoline, and similar materials by the partnership and used by the machinery in construction of the pipe line and in the performance of the contract between Anderson and the partnership.

(5) The claim of Claude Asp, an individual doing business as A. & B. Motor Sales, is based upon repair parts and certain labor performed in repairing the machinery used by the partnership.

The district court concluded that certain sums should be paid out of the $40,000 fund held by Northern Minnesota National Bank of Duluth in the following order:

(1) $275 to Northern Minnesota National Bank of Duluth as reimbursement for the necessary fees for legal services in performing

its duties and services in administering the escrow and trust fund.

(2) $26,590.73 (the same being $29,993.33 less $3,402.60) to the United States of America, department of internal revenue.

(3) $3,402.60 to the state of Minnesota, department of employment security.

(4) $1,504.70 to the county of Beltrami for personal property taxes for the year 1950. (The court determined that Beltrami county was not entitled to any moneys from the fund for taxes for the year 1951.)

(5) $8,118.78 to Standard Oil Company.

(6) $108.19 to Claude Asp, the balance of the $40,000 fund, to apply upon his judgment of $569.57.

■ The trial court's view of the case is found in its memorandum, which states in part:

"The Court is of the opinion that if defendants may recover at all they are entitled to recover upon the contractual provisions existing between the Pipe Line Company and Anderson Brothers Corporation and the contract between Anderson Brothers Corporation and the co-partnership, and upon the further ground that when the co-partnership, assigned the money due it from Anderson Brothers Corporation to the plaintiff bank, the plaintiff took said assignment subject to the terms and provisions and conditions of said contract."

It is clear from the court's memorandum that it concluded as it did because it thought that defendants had acquired rights under a contract to which they were not parties. In our opinion it was error for the trial court to so conclude. As a general rule, strangers to a contract acquire no rights under such a contract. 4 Dunnell, Dig. (3 ed.) § 1733; 12 Am. Jur., Contracts, § 277; La Mourea v. Rhude, 209 Minn. 53, 295 N. W. 304. A well-recognized exception to this rule has grown up under our law known as the doctrine of third-party beneficiary contracts. The nature of this doctrine is that the promisor engages to the promisee to render some performance to a third person. 2 Williston, Contracts (Rev. ed.) § 347. Stated differently, the general rule is that a third person may enforce a promise made for his benefit even though he is a stranger both to the contract

and the consideration. 12 Am. Jur., Contracts, § 277. Therefore, it is clear that the contractual right which third-party beneficiaries acquire under the doctrine is to enforce a promise made for their benefit which they otherwise would not be able to enforce. To come within the rule, a third party must be either a donee beneficiary or a creditor beneficiary. La Mourea v. Rhude, *supra*. A creditor beneficiary is defined as one to whom the promisee owes or is believed to owe a duty which is discharged by the promisor's performance. A donee beneficiary is one to whom the promisee intends to make a gift of the performance by the promisor. Restatement, Contracts, § 133 (1) (a, b) ; 2 Williston, Contracts (Rev. ed.) §§ 356, 361.

Here we are not concerned with the rule applicable to donee beneficiaries, since there is no evidence in the record from which it could be inferred that any of the parties intended to make a gift to defendants. Defendants, however, are all creditors of the partnership to whom a duty is owed by the partnership.

Thus, the only relevant question with respect to the application of the doctrine in this case is whether or not Anderson (promisor) had made a promise to the partnership (promisee) to pay defendants and thereby give defendants a right to force payment of the $40,000 to them rather than to plaintiff bank. If that was the case, then defendants could claim a right to the $40,000 which would be prior to the rights of plaintiff bank by reason of the contract between Anderson and the partnership. We have reviewed the contracts thoroughly, and at no place do we find Anderson promising the partnership that it would pay claims such as these defendants have against the partnership.

■ The next issue pertains to whether or not the assignment made to Northern National Bank of Bemidji was valid.

Defendants strenuously contend that this case comes within M. S. A. 513.23, which reads:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

Plaintiff takes the position (1) that § 521.02, dealing with the perfection of assignments, has superseded § 513.23; (2) that the lower court's finding that the partnership was insolvent at the time of the assignment is not supported by the evidence; and (3) that even if the partnership was insolvent the assignments were given for fair consideration and that is all that is required by § 513.23.

We do not deem it necessary to pass on any of the contentions except the one concerning whether or not the assignment was given for fair consideration. As can readily be seen from § 513.23, the only assignments from insolvents which are invalid as to creditors are those where the conveyance is made or the obligation is incurred without fair consideration. The words "fair consideration" are defined in § 513.22, which reads:

"Fair consideration is given for property, or obligation,

"(1) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

"(2) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

In the case at bar, when the assignment was given, the partnership was indebted to plaintiff bank in the sum of $77,000. After the assignment was given the bank continued to extend credit to the partnership. While the total amount paid by Anderson amounted to slightly over $485,000, the partnership will still be indebted to plaintiff for over $120,000 even if plaintiff prevails and collects the $40,000 which represents the last money to be paid out under the contract.

Our court has held that a promise to furnish labor and materials in the future is fair consideration for an assignment. Schlecht v. Schlecht, 168 Minn. 168, 209 N. W. 883. We see no valid distinction between the furnishing of labor and materials and the furnishing of money to this partnership because, if the money had not been furnished, the contract could not have been completed. Therefore, in

our opinion it was a valid assignment for which fair consideration was given.

■ The last issue to be decided is whether, in spite of the validity of the assignment, any of the defendants have a prior right to the funds in Northern Minnesota National Bank of Duluth.

In regard to the claim of the United States of America, it appears that on October 31, 1950, some time after the assignment was given, there was due from the partnership to the United States only $75.67. This was due to an error in a previous return. From that time the amount due the United States increased a great deal. Assessment lists for taxes due by the partnership were received by the then collector of internal revenue on the following dates: April 16, 1951, June 15, 1951, August 27, 1951. On October 16, 1951, the United States government filed a notice of tax lien with the register of deeds of Beltrami county in the amount of $20,399.21. The United States claims that under 31 USCA, § 191, it has priority over claims of other creditors by reason of the insolvency of the partnership. As far as is pertinent here, § 191 reads:

"Whenever any person indebted to the United States is insolvent, * * * the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

On the other hand, plaintiff bank contends that, under 26 USCA, §§ 3670 and 3671, the United States did not acquire a lien on all property and rights to property of the partnership until the assessment lists were received by the collector. These sections read as follows:

§ 3670. "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in

favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

§ 3671. "Unless another date is specifically fixed by law, the lien shall arise at the time the assessment list was received by the collector and shall continue until the liability for such amount is satisfied or becomes unenforceable by reason of lapse of time."

We agree with plaintiff on this issue. In Maryland Cas. Co. v. United States (Ct. Cl.) 53 F. Supp. 436, the plaintiff contended that 31 USCA, § 191, was not applicable except where, in the case of a living debtor, his insolvency is a formal one evidenced by a bankruptcy, receivership, or assignment for the benefit of creditors. The court in that case stated (53 F. Supp. 439):

"We agree with the plaintiff as to the construction of R. S. § 3466 [31 USCA, § 191]. A provision in similar language has been in the statutes since 1797 and has always been construed as plaintiff would have us construe it."

See, United States v. Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. ed. 638; Board of Sup'rs v. Hart, 210 La. 78, 26 So. (2d) 361, 174 A. L. R. 1366.

In the case at bar, there has been no bankruptcy proceeding, receivership, or assignment for the benefit of creditors; therefore, 31 USCA, § 191, is not applicable here. Plaintiff's right to the fund was prior to that of the United States because the lien acquired by plaintiff arose before the assessment lists were received by the collector.

With respect to Beltrami county, its claims are based upon 1950 personal property taxes due it from the partnership. However, neither the Anderson account nor the escrow fund were included in the tax assessment. In Land O' Lakes Dairy Co. v. County of Wadena, 229 Minn. 263, 39 N. W. (2d) 164, we took the position that, even though personal property taxes are imposed upon the owner thereof *in personam,* under M. S. A. 272.50 such taxes are a lien on the property because of which the owner is taxed. Beltrami county concedes that this is contrary to its position in the case at bar but contends that our position in the Land O' Lakes case is due to a misconstruc-

tion of the statutes. We have, in the light of this objection, reconsidered § 272.50 and conclude that our rule in the Land O' Lakes case should stand.

In regard to the claims of Claude Asp and Standard Oil Company, it appears that garnishments were served on Anderson by these defendants on December 11, 1951, and October 10, 1951, respectively. The rule with respect to garnishments which is applicable here is that these defendants could occupy no better position against Anderson than would the partnership in a suit by it against Anderson. Bacon v. Felthous, 103 Minn. 387, 115 N. W. 205; Gilbert v. Pioneer Nat. Bank, 206 Minn. 213, 288 N. W. 153. It is also clear that the lien acquired by the service of a garnishment summons does not attach to debts assigned by the defendant prior to such service. 8 Dunnell, Dig. (3 ed.) § 3957; see, First State Bank v. Woehler, 140 Minn. 32, 167 N. W. 276; Nash v. S. M. Braman Co. 210 Minn. 196, 297 N. W. 755.

In the case at bar the garnishment summons was served more than one year after the first assignment from the partnership to plaintiff bank. It is thus clear that Standard Oil Company and Claude Asp received no rights prior to those of plaintiff to the $40,000 escrow fund.

We have examined the various other contentions raised by defendants and find them to be without merit.

Reversed with directions to Northern Minnesota National Bank of Duluth that, after deducting $275 fees allowed by the district court for services in performing its duties in administering the escrow and trust fund, it pay the balance of $40,000 to plaintiff bank.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On April 29, 1955, the following opinion was filed:

PER CURIAM.

Appeal from clerk's taxation of costs against the state of Minnesota. The basis of the objection is that the state was acting in its sovereign capacity and that no costs or disbursements should be taxed against the sovereign in the proceedings involved. The state contends that, in interposing its defense and asserting its rights, it

was acting in a governmental capacity in seeking to enforce payment of taxes due it under the provisions of the Minnesota employment security law and that, in so doing, it was entitled to the immunities of governmental sovereignty. It further contends that it intervened solely because the United States of America was made a party defendant and that it sought recovery only of a portion of any sum which might be awarded the United States because of the "Credits against tax" provision of the Internal Revenue Code. 53 Stat. 1387, 26 USCA, § 1601(a)(1).

It is our opinion under the record here that the state was acting in its sovereign capacity to collect taxes rather than in an ordinary action for the recovery of money and property and that, acting in such sovereign capacity, it is immune from the taxation of costs. State ex rel. Smiley v. Holm, 186 Minn. 331, 243 N. W. 133; State v. McCoy, 228 Minn. 420, 38 N. W. (2d) 386; Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 54 N. W. (2d) 912; State, by Peterson, v. Bentley, 224 Minn. 244, 28 N. W. (2d) 179, 770.

In connection with the appeal from the clerk's taxation of costs against County of Beltrami in the same matter, it is our opinion that the same rule applies; that the county is also immune under the circumstances here; and that costs and disbursements cannot be taxed against it.