**Jill HOLLAND, et al., Respondents,**

v.

**DICK YOUNGBERG CHEVROLET–BUICK, INC., Appellant,**

No. C9–83–1503.

Court of Appeals of Minnesota.

May 1, 1984.

Paul L. Pond, Reed & Pond, Mound, for respondents.

Douglas P. Anderson, Rosenmeier & Anderson, Little Falls, for appellant.

Heard, considered and decided by FOLEY, P.J., and WOZNIAK and SEDGWICK, JJ.

### OPINION

FOLEY, Judge.

Defendant appeals the trial court judgment for plaintiff, based on the special verdict rendered by a jury in Wright County District Court, awarding plaintiff $34,683 for return of the Chevrolet C–70 truck he had purchased from defendant together with additional incidental and consequential damages of $10,075.

The special verdict of the jury included the finding that plaintiff Robert Holland revoked acceptance of the Chevrolet C–70 truck.

Although appellant-defendant initially challenged the jury's findings on several grounds, at oral argument it withdrew all challenges to the jury verdict except its challenge to the above jury finding. This appeal is then limited to a consideration of whether there is evidence to support the jury's conclusion that respondents revoked acceptance of the truck purchased from appellant.

## FACTS

On April 20, 1981, Holland went to Dick Youngberg Chevrolet-Buick, Inc. (Youngberg Chev.) in Little Falls, Minnesota to inquire about purchasing a new truck. Holland told salesman Gene Drong he "was getting into the custom harvesting business and needed a truck that would adequately pull a combine down the road and be able to haul 500, 600 bushels of grain good." In addition, Holland "wanted something that would really outperform ... my old truck," something that had "[m]ore power" and would "be able to pull the loads faster."

Holland testified that Drong responded:

I've got the truck just for you sitting right out here in the lot out here ... I've got a truck that you'll be able to haul a load with that, no problem with it at all, you'll be able to hook onto that combine, you'll be able to roll down the road faster than the speed limit, if you want to.

In addition, Holland testified:

He told me there was people, other customers of his, getting 10 to 14 miles to the gallon doing what I was going to do. He said, "You should have no problem getting 10 miles to the gallon at all." ... He gave examples of one guy pulling a grain pup [an extra grain trailer], you know, hauling just a tremendous amount of weight. No problem at all with the truck. That's what sold me on the truck, when he said that.

Drong arranged to sell Holland a fully equipped 1981 C–70 Chevrolet medium-duty truck. Drong testified that he told Holland that the 1981 Chevrolet C–70 truck had a gross vehicle weight capacity of 50,000 lbs —Holland's intended load once a box was put on the truck and the trailer with the combine was hitched on back.

On May 27, Holland picked up the new C–70 truck, delivering his 1967 Chevrolet truck as a trade-in. Driving the truck home Holland noticed:

The truck would hardly run at all. It was just smoking. I could barely keep it going. Well, I stopped. The fuel gauge was low, and I stopped and put in a bunch of new diesel fuel. When they were filling it up, I called back to Gene Drong and told him what the problem was, and he said, "Put new fuel in and that will help it some," and he said, "Just drive it home."

The new fuel helped "a little bit."

On Friday, May 29 the purchase agreement was signed. On June 1, 1981 Holland headed for Kansas in the new C–70 truck with a box, hauling his combine on its own trailer; gross vehicle weight was approximately 50,000 lbs. Holland immediately experienced a lack of power. He could average no more than about 30 miles per hour on the way to Kansas; 40 m.p.h. on level grade.

When he got to Kansas, Holland called Drong and complained about the lack of power. Drong told him to take it to the local dealer. A Chevrolet dealer in Caldwell, Kansas checked the throttle linkage and inserted new fuel filters on June 15th. Holland testified that "it didn't make any difference to the performance of the truck."

After he began harvesting, the truck developed transmission problems. The truck was again taken to the local dealer where the transmission was repaired and reconditioned. This servicing tied the truck up for a day-and-a-half and did not improve the truck's power.

In mid-July Holland left Kansas for a farm in South Dakota. Holland's truck averaged about 30 miles per hour and 4.5 miles per gallon while pulling the combine.

Holland returned to Buffalo on July 20 and called Gene Drong to report his dissatisfaction over the lack of power he had in the new C–70 truck. Holland began harvesting his own crops but because of the continued lack of power in the truck he called Drong again. At this time Jill Holland drove the truck and experienced: "Just a dreadful lack of power. I had the foot feed to the floor and nothing. It was terrible."

Drong told Holland to bring the truck in and try a Kodiak truck with a cat engine in it. About the first of August Holland did this and found the loaner truck with a slightly bigger, 210 horsepower diesel engine, more effective.

Drong called Holland about August 18 to report that his C–70 truck had been checked out and he wanted the loaner returned. When Holland returned the loaner truck he asked Drong to sell the C–70 truck. Holland testified: "He said that he would sell that truck and try to get us our money back that we had invested in it."

Holland called Drong 10 times after August 18th to see if the truck had sold. In late September Holland informed Drong he really needed a truck. Drong then told him that the C–70 truck had been sold, that it was just a matter of financing to close the deal. Holland couldn't wait any longer for a truck so he arranged to pick up his original trade-in vehicle the day before the financing was to be arranged on the sale of the C–70 truck.

Holland was then asked to re-purchase his trade-in truck. He wrote out a check and that afternoon stopped payment on it, "thinking that maybe this was all probably a lie that he had this truck supposedly sold, the new one supposedly sold." "[T]he next day, when the new truck was supposedly all sold and done with, I called Gene Drong up, and he said that the whole deal fell through, he couldn't get financing or something or didn't want the truck any more, and it kind of—I expected that that's what would happen and that's exactly what did happen."

Holland filed suit against Youngberg Chev in October 1981. Youngberg filed a counterclaim against Holland seeking payment for the 1967 trade-in truck Holland took back from the dealer and for which he issued a check on which payment was stopped.

Following judgment for plaintiff, defendant appeals. At oral argument defendant-appellant withdrew all issues from our consideration except the following:

**ISSUE**

Whether there is evidence to support the jury's conclusion that respondent Robert Holland revoked acceptance of the truck he had purchased from appellants?

**ANALYSIS**

*Revocation of Acceptance:*

■ The court instructed the jury that the following is required for an effective revocation of acceptance:

1. That the goods must be nonconforming. That is they are not in accordance with the obligation under the contract.

2. The nonconformity must substantially impair the value of the goods to the buyer.

3. The buyer must have accepted the goods on the reasonable assumption that the nonconformity would be cured.

4. The nonconformity must not have been reasonably and seasonably cured.

5. The buyer must notify the seller of his revocation.

6. Revocation must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects.

7. The buyer must take reasonable care of the goods for which he has revoked acceptance.

This instruction is consistent with Minn. Stat. § 336.2–608 (1982).

Appellant argues respondents did not prove revocation of acceptance because:

1. There was no substantial impairment of the vehicle because respondent-Holland was still able to combine ¼ of the Kansas harvest and all of his own;

2. Repairs reasonably and seasonably cured any defect.

3. Respondents never gave timely notice of revocation; appellant first learned of revocation when the suit was filed in October 1981.

*Standard of review:*

■ Conclusions based on a special jury verdict question should "be set aside only if perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable person." *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981).

*Substantial impairment:*

The court instructed the jury: "A substantial impairment is defined as a defect substantially interfering with the operation of the vehicle or a purpose for which it was purchased. Minor defects not substantially interfering with the truck's operation and economy are not substantial impairments." *See Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 354 (Minn.1978).

Appellant cites *Durfee* to support its contention that this court may reverse the jury conclusion on this issue since the ultimate conclusion whether substantial impairment exists is a question of law. Appellant asserts that the fact Richard Holland was able to make $10,000–$12,000 combining in Kansas demonstrates that there was no substantial impairment of value. Appellant also asserts that computer simulation tests on the truck prove it can haul 50,000 lbs. at highway speeds.

Respondent-Holland responds that a truck which averaged about 30 m.p.h. on a trip to Kansas and back, was substantially impaired. The truck required more gas and time than he was led to expect. Holland could not custom combine as many days as he anticipated because the truck lacked the power necessary to haul the combine safely. A trip to North Dakota, planned for August 1981, was cancelled because Holland considered the truck unfit to haul the combine long distances.

An experienced truck salesman, Robert Hanzlik, testified that the requirements Holland had, hauling a combine on a trailer, or hauling 500–600 bushels of grain, could not be met by the C–70 truck that Drong sold him. Not only did the truck lack power, its front axle did not meet Minnesota requirements for hauling a 50,000 pound load. Driving the C–70 with an excess capacity of 4–6,000 pounds would cause the truck to wear out sooner and could cause an accident. Hanzlik concluded: "You bet it's unsafe. I wouldn't drive it. Empty, fine, but you don't buy trucks to go empty."

Hanzlik testified that Holland's needs required a 250–300 horsepower engine. Hanzlik described the C–70 Holland truck as "an ant-powered engine that's just under-spec, under-component, undersized motor truck. There's no question about that."

Salesman Drong testified he no longer sells the C–70 type truck for pulling grain pups or combines; instead he recommends a larger size truck.

One trucker, who came to Youngberg Chev to check out the advertised 1981 C–70 truck for hauling grain, testified that he "was very unimpressed with it for the power" because he couldn't "bring it up to road speed that night." He described the truck as "a real dog." The salesman who rode with him mentioned " 'Yeah, it don't have much.' "

None of the witnesses who drove the truck could exceed 40 m.p.h. with the loaded truck.

The only contrary evidence produced by appellant was: (1) testimony of Eugene Dick who achieved a speed of 55 m.p.h. with the *empty* truck in June 1982, and (2) the results of a computer simulated test conducted in the spring of 1982, which indicated the truck could achieve the speed of 55 m.p.h. with a full load.

However, the witness Dick, who is familiar with this model of truck, also testified: "It's not a truck that you would want to pull a combine or a pup trailer, in my opinion." He felt the truck lacked adequate power. The expert who testified regarding the computer simulated test acknowledged that the test did not account for wind resistance or less than perfect road conditions.

■ The special verdict reflects that the jury found the testimony of respondents, their witnesses and expert more credible than that of appellant's witness and expert. The jury conclusion that the truck's lack of power substantially interfered with the purpose for which it was purchased, is supported by the evidence and will not be set aside. We have no hesitancy in fully supporting the finding of the jury that the truck was an incredibly poor product for plaintiff.

*Reasonable & Seasonable Cure:*

Appellant complains that since respondents and their witnesses never drove the truck after it was repaired in August 1981 and May 1982, they did not prove the defects were not cured.

■ The Minnesota Supreme Court limits the seller's right to cure in cases like this:

> any right to cure should be limited to cases in which the defects are minor, and we hold that the seller has no right to cure defects which substantially impair the good's value.

*Johannsen v. Minn. Valley Ford Tractor Co.,* 304 N.W.2d 654, 657 (Minn.1981).

The *Johannsen* case is similar to the instant case in that a farmer purchased a new vehicle (tractor) because he was dissatisfied with one particular aspect of the old vehicle's performance (fourth gear slipped). However, the new vehicle presented the same—if not worse—problem. The defect caused the farmer to lose substantial time in plowing his fields (2 weeks to complete a four hour job). The Minnesota Supreme Court upheld the jury finding of substantial impairment and held that such a finding gave the seller no right to cure defects. *Id.*

■ Here, the evidence supports a similar holding. Respondents purchased the vehicle for the purpose of hauling a combine or grain, a weight of approximately 30,000 pounds, at highway speeds. Testimony consistent with the jury verdict shows that the loaded vehicle was not designed to meet the buyer's intended purpose. Applying *Johannsen,* we affirm the jury finding without further inquiry into repairs attempted by the seller.

*Timely Revocation:*

■ The jury was instructed that revocation must occur within a reasonable time after the buyer discovers the defect and before any substantial change in the condition of the goods occur. *See* Minn.Stat. § 336.2–608(2). What constitutes a reasonable time is a jury question. *Johannsen* at 657. Here, the jury found that the respondents revoked acceptance within a reasonable time.

■ The case of *Jacobs v. Rosemount Dodge-Winnebago South,* 310 N.W.2d 71 (Minn.1981), supports this conclusion. In *Jacobs* revocation was timely even though it occurred just short of 12 months after delivery of the motor home. The court reasoned:

> The Jacobs had accepted the vehicle on the reasonable assumption that any defects would be readily cured. Minn.Stat. § 336.2–608(1)(a). Under the circumstances of this case, we find that a year's time was not an unreasonably long time in which to attempt to make repairs. Defendants were on notice throughout that time that the Jacobs were dissatisfied and expected repair of the motorhome's defects. The motorhome was returned to defendants at least five times during that year for attempted repairs. To allow revocation in a case such as this is not unprecedented. *Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 374 A.2d 144 (1976) (revocation 14 months after initial delivery where the dealer had attempted, unsuccessfully, to repair the major defects in the vehicle); *Murray v. Holiday Rambler, Inc.,* 83 Wis.2d 406, 265 N.W.2d 513 (1978); *Durfee,* 262 N.W.2d 349 (revocation of the acceptance of a defective car 9 months after delivery).

*Id.* at 76. Here, Holland put appellant on notice almost immediately after delivery that the truck lacked power. This substan-

tial defect never changed and revocation of acceptance was timely and that finding is amply sustained by the evidence.

### DECISION

The jury's conclusion that respondents revoked acceptance of the 1981 C–70 truck sold to Richard Holland by appellant, including its conclusion that the truck was substantially impaired, that repairs did not (or could not) cure the defect, and that respondents gave timely notice of revocation, is supported by the evidence. We affirm.