**GOLD'N PLUMP POULTRY, INC., Appellant,**

**v.**

**SIMMONS ENGINEERING CO., Appellee.**

**No. 85–5186.**

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1986.

Decided Nov. 24, 1986.

Denis E. Hynes, St. Cloud, Minn., for appellant.

Donald R. Donovan, Hiram, Ga., for appellee.

Before HEANEY, JOHN R. GIBSON and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

Gold'n Plump Poultry, Inc. (Gold'n Plump) appeals from the judgment of the district court[1] dismissing this action for a full refund of the purchase price of two chicken processing machines. We affirm.

[1]. The Honorable Edward J. Devitt, United States Senior District Judge for the District of Minnesota.

## I. BACKGROUND.

In the fall of 1982, Armour Food Company (Armour) entered into negotiations with Simmons Engineering Company (Simmons) of Georgia for the purchase of two "venter opener" chicken processing machines [2] for Armour's Cold Spring, Minnesota plant. During the two years prior to purchase, Armour's profits from the Cold Spring plant had suffered because its chickens were oversized (up to five pounds and over). The standard average industry size was three and one-half pounds, and processing equipment was generally designed for average sized chickens, with tolerance up to approximately four pounds.[3] Armour sought to become more efficient in processing and to decrease chicken size. The latter could be accomplished through the feeding process.

Armour based its decision to purchase Simmons' machines on the results of an extensive two year investigation of venter opener machines. Before final selection, Armour solicited information from various plants throughout the country using Simmons' machines, including quality control reports with information on the effectiveness of processing relative to chicken *size*. In addition, Armour's chief engineer, general production manager, and a plant operations manager observed Simmons' venter openers operating satisfactorily in two Georgia plants. Similar machines were satisfactorily processing average size chickens in twenty-seven other plants around the country. Jim Theis, Armour's general manager at Cold Spring, had had experience dealing with Simmons since 1974 regarding Armour's turkey processing plants. In addition, Armour had been using three other Simmons machines on its processing lines in Cold Spring. Both in 1981 and 1982, Theis discussed the venter openers with Simmons in Atlanta.

Armour's former chief engineer testified at trial that Simmons repeatedly told Armour in various meetings and phone conversations prior to purchase that the machines would have no problem processing industry average size chickens weighing up to four pounds. He testified: "[We] knew what representations Mr. Simmons had made." Tr. at 282.

In October 1982, Theis requested a price quote from Simmons and it responded by letter of October 13, 1982:

> In response to your request, we quote as follows:
>
> One Simmons Venter/Opener (SVO–1011) $54,000.00 FOB Cold Spring, MN with Simmons installation supervision. Delivery would be 3–4 weeks A.R.O.
>
> We feel we have used the best engineering materials available, however, only time will prove us right. With this in mind, Mr. Simmons has instructed us to provide you with spare parts and service, at no charge, for six months, just as we have done for the other plants that have this equipment.
>
> \*       \*       \*       \*       \*       \*
>
> As you are aware, having seen the machine in operation, minimum installation problems will be encountered. A very small amount of vacuum and water are required.
>
> We sincerely appreciate your business.

This was the only written document evidencing the sale. Theis agreed to the terms of sale for Armour and ordered two machines. The full purchase price was $113,400, which included tax.

The first machine was installed at Cold Spring over the weekend of December 4 and 5, 1982. Processing began on Monday, December 6, 1982. Problems arose immediately because of the large size of Armour's five and one-half pound chickens.

---

**2.** The venter opener machines were designed for opening and eviscerating chickens. Simmons was at the forefront of this technology, as well as other new technology in the chicken processing industry, which involves highly complex machines. Before the recent development of these machines, the task required separate venting and opening machines. Twenty years earlier processing was done by hand.

**3.** Armour conceded at trial that the machines operated properly on industry average size birds.

The evidence discloses Armour was aware of the size problem. Its former chief engineer testified: "[T]he birds were excessively sized for what the machine was *purchased* and designed for." (Emphasis supplied). Simmons advised Armour not to install the second machine because of the size problem and was willing to take back the first machine. However, Armour insisted that Simmons attempt to modify the machines while it worked on decreasing chicken size. The second machine was installed and the size problems continued. Simmons spent more than $250,000 on modifications, and its research and development chief spent a total of three months at the Cold Spring plant.

Simmons' terms of sale were that Armour pay cash within ten working days from the date of installation. More than two months after the sale Armour still had not paid Simmons, however. To obtain payment, Simmons issued a letter to Armour [4] dated February 14, 1983:

> * * * [I]n the event our venter openers do not function within reasonable tolerance; we will refund all monies paid to us for this equipment.

> We reserve the right to make such modifications as we deem proper in an attempt to attain a satisfactory machine.

> We further assure you our best effort.

This letter prompted Armour's full payment of the purchase price of $113,400 to Simmons. On March 2, Armour received approval of the formal purchase order from its Phoenix home office. The only written terms of the purchase order were "as agreed." Armour's Jim Theis testified that the corporate approval and issuance of the purchase order were only a formality. Theis further testified that Armour paid the exact price as agreed to in December and did not adjust the price based on Simmons' February 14 letter.

On April 1, 1983, Armour sold its entire Cold Spring plant, including the disputed machines, to Gold'n Plump. Gold'n Plump had been created at this time by its parent, JFC, Inc., to own and operate the Armour Cold Spring processing facility. Despite Gold'n Plump's full knowledge of the size problem, the plant sale agreement provided for transfer of the machines to Gold'n Plump "as is" and with an express warranty disclaimer.[5]

Prior to the plant sale, Jack Frost, Inc. had raised chickens and supplied them to Armour for processing and marketing under a joint venture agreement. Gold'n Plump and Jack Frost, Inc. were both wholly owned subsidiaries of JFC, Inc. The parent corporation actually negotiated the plant purchase with Armour. However, ownership transferred directly from Armour to its newly created subsidiary Gold'n Plump.

Gold'n Plump did not purchase the disputed machines unwittingly. Theis, the plant manager, who had negotiated the machine purchase from Simmons in December, transferred to the same position with Gold'n Plump. Gold'n Plump's Dale Nelson, vice president of finance and administration, testified that Gold'n Plump insisted upon purchasing the entire plant with clear title and under "a clean deal." He testified that were it not for Gold'n Plump's insistence, the plant purchase documents could have been changed and the disputed machines purchased without Armour having paid Simmons before the plant sale. Tr. at 137–139. Under the plant sale agreement, Gold'n Plump paid Armour "net book value" for the two Simmons machines. This was $113,400 or the full purchase price which Armour had paid Simmons, despite testimony of Theis and other Gold'n Plump witnesses that the machines were worthless. Nelson also testified to a full under-

---

**4.** Gold'n Plump was not yet in existence as a legal entity.

**5.** The agreement provided:

To the extent it desires [Gold'n Plump] has been given or will have been given full opportunity by [Armour] to examine, or cause to be examined the Assets. As a result [Gold'n Plump] agrees to purchase and assume possession of the Plant and Machinery and Equipment *'as is'*—'where is' condition as of Contract Date * * * it being understood that *[Armour] makes no* representations, *warranties* or covenants, *express or implied* with respect to same or condition thereof. [Emphasis supplied.]

standing of the "as-is" warranty disclaimer language in the plant sale:

> Well, that was the documentation produced by the attorneys for Greyhound, Armour's parent company, to mean that Armour was selling these assets to us in Cold Spring functioning as they are and not—you know, not guaranteeing their performance. And if something went wrong with the machines, they're basically saying that you can't go back after Armour.

[Tr. at 125.]

JFC, Inc. and its two subsidiaries, Jack Frost, Inc. (chicken supplier) and Gold'n Plump (processor and marketer), were legally separate corporations with their own personnel, assets, and books. Theis testified at trial that none of these corporations had any relationship with Simmons: a) they were not involved in the December machine purchase; b) they were not involved in the February 14 letter prompting the purchase price payment; and c) they did not receive any warranties from Simmons. Moreover, the Gold'n Plump corporation did not exist at the time of the contractual dealing between Armour and Simmons.

Following the sale of the plant to Gold'n Plump, of which Simmons management was unaware, Simmons continued its efforts to modify the machines, without success. In May, July and August 1983, Gold'n Plump made requests for a full refund of the purchase price, relying upon Simmons' February 14 letter to Armour. Simmons ignored these requests. Gold'n Plump subsequently removed the machines from operation and brought this diversity action seeking a refund of the original $113,400 purchase price.

A two-day bench trial ensued in March 1985, and the district court entered judgment denying relief to Gold'n Plump. This appeal followed.

## II. DISCUSSION.

Gold'n Plump contends that under Minnesota's version of the Uniform Commercial Code (U.C.C.) it is entitled to a full purchase price refund based on (A) Simmons' implied and express warranties to Armour; (B) its revocation of acceptance; and (C) the doctrine of sale on approval. These issues involve both questions of fact and questions of state law. With regard to the questions of state law, in this diversity case, we will give substantial weight to the decisions of the district court on matters which have not yet been treated by the state courts. *See Sigma Chemical Co. v. Harris,* 794 F.2d 371, 373 (8th Cir.1986). We will not disturb the factual findings of the district court unless they are clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Rogers v. Masem,* 788 F.2d 1288, 1292 (8th Cir.1985).

### A. Warranties.

#### 1. Assignment.

Gold'n Plump asserts that the plant sale agreement provided for assignment of Armour's warranty rights against Simmons.

The Minnesota U.C.C. authorizes such an assignment of contract rights. *See generally* Minn.Stat.Ann. § 336.2–210 (West 1966). However, a subsequent purchaser of a warranted article is not automatically entitled to a cause of action against the original seller for breach of warranty. There must be a contract of assignment of rights to entitle the subsequent purchaser to this cause of action. *See generally* 8 S. Williston, *A Treatise on the Law of Contracts* § 998 (3d ed. 1961 supp. 1985). An assignment generally requires the underlying elements of a valid contract, including intent. 6A C.J.S. Assignments § 43 (1975); *see generally Springer v. J.R. Clark Co.,* 138 F.2d 722, 726 (8th Cir.1943); *Guaranty State Bank of St. Paul v. Lindquist,* 304 N.W.2d 278, 280–81 (Minn.1980); *Pillsbury Investment Co. v. Otto,* 65 N.W.2d 913 (Minn. 1954). Whether or not an assignment occurred is a question of fact for the trial court. *See* 6A C.J.S. Assignments § 57 (1975) (assignment is a contract); *Capital Warehouse Co., Inc. v. McGill-Warner-Farnham Co.,* 149 N.W.2d 31, 35 (Minn. 1967) (whether parties entered into contract is a question of fact).

■ There is no evidence in the record of intent to assign Armour's warranty rights against Simmons. The mere sale of the plant did not create a warranty assignment. Although the sales agreement specifically listed certain of Armour's rights against third parties as assigned to Gold'n Plump, it made no reference to rights against Simmons. The omission of this assignment clearly indicates that Gold'n Plump did not intend to reserve a right of direct action against Simmons. We note further that the parties negotiating the plant sale agreement were fully aware of the problems with the venter opener machines. Accordingly, we affirm the district court's conclusion of no valid assignment.

## 2. Implied Warranty of Fitness for a Particular Purpose: Alter Ego Theory.

Gold'n Plump claims that it is entitled to recover under the implied warranty of fitness for a particular purpose which arose at the time of the original December sale of the machines. It contends that Simmons knew the machines were intended for use on large-sized Minnesota chickens, giving rise to an implied warranty of fitness for a particular purpose. It argues that because of its close relationship to Armour, in effect, it was a party to the original sale.

■ We hold that the district court correctly rejected this theory, reasoning as follows:

> Gold'n Plump does not contend that it was a third party beneficiary of the contract, nor does the evidence so show. But it claims that it was so closely related to Armour that Gold'n Plump was 'in fact if not [in] name, * * * a party to the original agreement.' * * *
>
> The alleged close association is that stemming from Gold'n Plump's status as

a wholly owned subsidiary of JFC, Inc., the parent company of Jack Frost, Inc., which was a party to the joint venture agreement with Armour. Shared parentage alone does not justify an inference that two separate and independent subsidiaries of the parent have any relationship between them. In fact, Gold'n Plump did not exist as a corporate entity until March 16, 1983—two weeks after Armour formally approved the purchase contract and only two weeks before Gold'n Plump bought Armour's assets. No evidence was introduced to suggest that Jack Frost, Inc., or its parent were involved in contract negotiations with Simmons regarding the purchase of the venter-openers or that Simmons believed the companies were involved. On the contrary, the evidence clearly demonstrated that Armour purchased the machines with its own money and sold the machines on April 1, 1983, without distributing any of the sale proceeds to Jack Frost, JFC or Gold'n Plump. Gold'n Plump has not established that a close relationship existed between it and Armour's joint venture partner Jack Frost, nor is there any evidence that Gold'n Plump's relationship to Armour, through Jack Frost, was so close as to render Gold'n Plump a party to the original purchase contract with Simmons.

## 3. Express Warranty Under the February 14, 1983 Simmons Letter to Armour.

Gold'n Plump alternatively argues that it has statutory rights as third party beneficiary of Simmons' letter of February 14, 1983 to Armour. Gold'n Plump contends the letter was an express warranty, that if the machines did not operate properly after further modification, Simmons would refund the full purchase price.[6]

**6.** The Minnesota version of the U.C.C. limits damages for breach of warranty to three theories: (1) general damages or the difference in value between the goods as accepted and what they would have been worth as warranted; (2) incidental damages or those expenses reasonably incurred in receipt and custody of the product; and (3) consequential damages or injuries to person or property proximately resulting from the breach. Minn.Stat.Ann. §§ 336.2–714, 2–715 (West 1966); *see generally Peterson v. Bendix Home Systems, Inc.,* 318 N.W.2d 50, 53 (Minn.1982). The only way for a plaintiff to recover under the U.C.C. for breach of warranty outside of these damages theories is to show

■ Under general contract (non-U.C.C.) law, a plaintiff must show privity of contract with a defendant to have a right of enforcement. Strangers to a contract acquire no rights under the contract. *See Anderson v. First Northtown National Bank,* 361 N.W.2d 116, 118 (Minn.Ct.App. 1985) *citing Northern National Bank v. Northern Minnesota National Bank,* 70 N.W.2d 118, 123 (Minn.1955). If no intent to benefit is shown, a beneficiary is no more than an incidental beneficiary and cannot enforce the contract. *Id., citing Buchman Plumbing Co., Inc. v. Regents of the University of Minnesota,* 215 N.W.2d 479, 483–484 (Minn.1974). Whether the parties intended to benefit a third party is a question of fact. *See Julian Johnson Construction Corp. v. Parranto,* 352 N.W.2d 808, 811 (Minn.Ct.App.1984). Whether or not a case presents a valid exception to the privity requirement is a question of law. *See Freeman v. Schmidt Real Estate & Insurance, Inc.,* 755 F.2d 135, 137 (8th Cir.1985).

■ The Minnesota U.C.C. creates a broad exception to the privity requirement, permitting recovery by any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the seller's warranty. Minn.Stat.Ann. § 336.2–318 (West Supp.1986).

■ However, in order for Gold'n Plump to recover under the February 14 letter, the express warranty must arise from the bargain of the parties at the time of the sale. *See* Minn.Stat.Ann. § 336.2–313 (West 1966); *cf. O'Laughlin v. Minnesota Natural Gas Co.,* 253 N.W.2d 826, 830 (Minn.1977) (warranty sections of U.C.C. specifically require a sale); *BarclaysAmerican/Business Credit, Inc. v. Cargill, Inc.,* 380 N.W.2d 590, 591 (Minn. Ct.App.1986) (a limited warranty in a sale of goods, to exclude implied warranties of merchantability and fitness, must accompany the sale). A "sale" is defined as "the passing of title from the buyer to the seller for a price." Minn.Stat.Ann. § 336.2–106(1) (West 1966). Whether or not a sale occurred is a question of fact for the trial court. *See Great Lakes Varnish Works v. Borgen,* 237 N.W.2d 609 (Minn.1931). Absent explicit agreement to the contrary, title passes upon physical delivery of the goods to the buyer. Minn.Stat.Ann. § 336.-2–401(2) (West 1966); *see also Gross v. Powell,* 181 N.W.2d 113, 118 Minn.1970) (title passed to buyer at time of delivery despite subsequent dishonor of his check). Thus, the time of payment for the goods is not determinative in deciding whether title has passed and there has been a sale. *Cf. id.* In summary, the U.C.C. exception to the privity requirement is limited to an action on a warranty arising at the time of sale, which is generally the date of delivery of the goods.

The district court viewed the February 14 letter as merely consideration for Armour's payment of the purchase price of the machines. The court found no evidence that Gold'n Plump was an intended beneficiary of the guarantee for a refund or in any way entitled to assert rights under the December sales agreement.

■ The district court did not err in denying relief to Gold'n Plump based on the February 14 letter. The letter was not an express warranty arising at the time of sale. The time of sale was December 1982, the dates of delivery, since the parties never agreed that title would pass at any other time. *See* Minn.Stat.Ann. §§ 336.2–106(1),

---

that the underlying contract provided for additional remedies. *See* Minn.Stat.Ann. § 336.2–719(1)(a) (West 1966).

We note that the district court correctly rejected Gold'n Plump's claims as a third party beneficiary of the implied warranty of fitness arising at the time of the December sale, because of failure to assert an appropriate theory of damages. While the February 14 letter might be construed as supplanting the U.C.C. limitation on remedies, we reject this view as discussed below. Because the letter was not part of the sales agreement, Gold'n Plump may not assert statutory rights as a third party beneficiary of the letter. Lack of privity prevents Gold'n Plump from recovering as a direct beneficiary of the letter. By failing to plead damages for breach of warranty in accordance with the U.C.C., Gold'n Plump thus gave the district court a Hobson's choice: full purchase price refund or nothing.

2–313, 2–401(2) (West 1966); *Gross,* 237 N.W.2d at 118. The fact that payment did not occur until March 1983 is irrelevant as to the time of sale. *See Gross,* 237 N.W.2d at 118. The fact that issuance of the purchase order did not occur until March 1983 is also irrelevant as to the date of sale because the purchase order was a mere formality. Because the February 14 letter was not a warranty attaching to a sale of goods, Gold'n Plump does not have statutory rights as a third party beneficiary of the promise. *See* Minn.Stat.Ann. § 336.2–318 (West Supp.1986) (limited to a "seller's warranty"); *cf. O'Laughlin,* 253 N.W.2d at 830 (warranty sections of U.C.C. require a sale); *BarclaysAmerican/Business Credit, Inc.,* 380 N.W.2d at 591 (limited warranty issued twenty-two days after the sale invalid).

■ Outside of the U.C.C. Gold'n Plump also lacks a right to enforce the terms of the letter. It clearly lacked privity of contract with Simmons because it did not exist at the time of the issuance of the February 14 letter. The district court did not err in denying relief to Gold'n Plump under the February 14 letter because Gold'n Plump was merely an incidental beneficiary of the promise. *See Anderson,* 361 N.W.2d at 118.

**B. Revocation of Acceptance.**

Gold'n Plump argues that in requesting a refund under the February 14 letter to Armour, it properly revoked any acceptance of the machines and is entitled to a refund.

■ A buyer may revoke his acceptance of an item whose nonconformity substantially impairs its value if he accepted it on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured. Minn.Stat.Ann. § 336.2–608(1)(a) (West 1966). Revocation of acceptance must occur within a reasonable time and before any substantial change in the condition of the goods not caused by their own defects. Minn.Stat.Ann. § 336.-2–608(2) (West 1966); *see generally Holland v. Dick Youngberg Chevrolet-Buick, Inc.,* 348 N.W.2d 770 (Minn.Ct.App.1984).

■ Here, again, Gold'n Plump's reliance on the letter takes it outside the protection of the U.C.C. third party beneficiary principle, and into non-U.C.C. contract law. As discussed above, privity likewise bars this claim.

**C. Sale on Approval.**

Gold'n Plump contends that it is entitled to return the machines for a full refund because the sale was on approval. According to Gold'n Plump, Simmons' conduct and representations manifested a sale for use on a trial basis. Gold'n Plump cites Simmons' promises to Armour to modify the machines, provide free service and spare parts for a six-month period, and refund the purchase price if the machines malfunctioned.

■ A sale is on approval only if the parties agree that the proposed buyer may return the goods even though they conform to the sales contract.[7] The general presumption runs against a delivery to a consumer being a sale on approval, however. *See* U.C.C. § 2–326, comment 1 (1962); *accord In re Sitkin Smelting and Refining, Inc.,* 639 F.2d 1213, 1218 (5th Cir.1981); *Security Insurance Co. v. Alliance Mutual Insurance Cos.,* 408 F.2d 878, 881 (10th Cir.1969). The district court held that Gold'n Plump failed to establish a sale on

---

7. Minn.Stat.Ann. § 336.2–326 (West 1966). The U.C.C. official comment provides:

A "sale on approval" * * * involves a contract under which the seller undertakes a particular business risk to satisfy his prospective buyer with the appearance or performance of the goods in question * * *. The price has already been agreed. The buyer's willingness to receive and test the goods is consideration for the seller's engagement to deliver and sell * *.

The right to return the goods for failure to conform to the contract does not make the transaction a "sale on approval" * * *. [Section 2–326] is not concerned with remedies for breach of contract. It deals instead with a power given by the contract to turn back the goods even though they are wholly as warranted.

U.C.C. § 2–326, comment 1 (1962).

approval. The court reasoned that Simmons' promises to modify the machines and provide free service and parts did not create a sale on approval, nor did the subsequent guarantee of a refund. The district court did not err in finding no sale on approval.

## III. CONCLUSION.

Accordingly, we affirm the judgment of the district court denying relief to Gold'n Plump.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In denying Gold'n Plump a remedy for Simmons's breach of the express warranty, the majority unnecessarily reduces the protections afforded by the warranty provisions of the U.C.C.

Minnesota's version of U.C.C. Section 2–313(1) states that an express warranty includes, "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Minn.Stat. § 336.2–313(1)(a) (1986). Thus, to assert rights under an express warranty one must first show 1) an affirmation of fact or promise; 2) made by the seller to the buyer; 3) relating to the goods; and 4) that is the basis of the bargain between the parties.

After Simmons delivered the machines to Armour, the rights of the parties were not at all certain. The machines were not functioning properly, and Armour indicated it would refuse to pay for them until the problems were corrected. At this point, instead of risking ill feelings in what appeared to be a beneficial ongoing business relationship, Simmons sent Armour the February 14, 1983, letter proposing to modify the parties' contract. The letter stated:

This is to certify that in the event our venter openers do not function within reasonable tolerances; we will refund all monies paid to us for the equipment.

We reserve the right to make such modifications as we deem proper in an attempt to attain a satisfactory machine.

In return for the modification, Armour paid the purchase price of the machines to Simmons. In this context, Simmons's letter clearly constitutes an express warranty. The letter contains a promise by the seller (Simmons) relating to the goods that was a basis of the bargain between the parties.

The majority argues that the letter cannot constitute an express warranty because it did not arise from the bargain of the parties at the time of the sale. Such a requirement, however, is not found in Minn.Stat. § 336.2–313 (covering warranty creation), in any other section of Minnesota's version of the U.C.C., or in the case law. The reason for the lack of authority supporting the majority's position is clear. Although a warranty must arise out of a sale, there is no requirement that it arise at the same time as the sale.[1]

Despite the statutory gloss of the U.C.C., warranties remain essentially contract items to be agreed upon by the parties. There is no reason a contract may not be modified to include a warranty term in accordance with applicable law governing contract modification. *See* Minn.Stat. § 336.2–209 (modification of a contract binding without consideration provided it is in good faith and the contract, as modified, meets the requirements of the statute of frauds).

---

1. The cases cited by the majority in support of its view are inapposite. *BarclaysAmerican/Business Credit, Inc. v. Cargill, Inc.,* 380 N.W.2d 590, 591 (Minn.Ct.App.1986), prohibited exclusion of certain warranties after a sale. Exclusion or modification of warranty is specifically covered by Minn.Stat. § 336.2–316. The section does not, however, address or place any limitation on creation of warranties. *O'Laughlin v. Minnesota Natural Gas Co.,* 253 N.W.2d 826, 830 (Minn.1977), is simply a case in which the applicability of Article 2 of the U.C.C. was in question for the purpose of determining whether the warranty sections of the article applied to a contract to sell and install a furnace. The court held that the contract involved a "sale of goods" to which U.C.C. Article 2 applied. The instant case involves no such issue. Neither party seriously contests that the instant contract involves a sale of goods to which U.C.C. Article 2 and its warranty provisions apply. In any event, neither case supports the proposition that a warranty must arise at the time of sale in order to be enforceable.

The district court recognized this point in its findings. It stated: "The agreed upon terms of purchase were established at trial to include Simmons's promised six months of free parts and labor *and its guaranteed refund in the event the machines failed to work satisfactorily.*" (Emphasis added.) Thus, the effect of Simmons's letter of February 14, was to modify the existing contract to include an express warranty in favor of Armour. The issue presented by this appeal is whether Gold'n Plump, as successor to Armour, can hold Simmons to the express warranty it created.

Simmons argues that it is not liable to Gold'n Plump on the express warranty because there is no privity of contract between Gold'n Plump and Simmons. Lack of privity, however, does not bar Gold'n Plump from enforcing the express warranty. As the majority recognizes, "the Minnesota U.C.C. creates a broad exception to the privity requirement." Minn.Stat. § 336.2–318 (1986) provides:

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

*Id.*

Section 336.2–318 allows Gold'n Plump to assert Armour's rights under the express warranty because it may have been reasonably expected to use, consume, or be affected by the machines. Although a seller of an item may not always be reasonably expected to foresee the use to which it will be put on resale or the exact party to whom it may be resold, it is foreseeable that, at some point, the item may be resold and used by a different party. There is no sound policy basis for releasing the seller from its warranty obligations on account of the resale. Indeed, to do so, absent a clear intent of the parties to the contrary, is to create a windfall for a seller who has breached its warranty at the expense of an innocent subsequent purchaser.[2]

In *Industrial Graphics, Inc. v. Asahi Corp.,* 485 F.Supp. 793 (D.Minn.1980), Judge Harry MacLaughlin recognized the strong considerations in favor of allowing a subsequent purchaser to bring an action based upon an original seller's warranty. He stated:

Third, not allowing such recovery could theoretically encourage manufacturers to utilize thinly capitalized intermediary corporations to sell defective products, thereby escaping liability. Fourth, the rule barring such recovery from non-privity defendants plainly encourages multiple litigation, thereby undermining judicial resources. Fifth, and perhaps most important, is that the fears underlying the decisions barring such recovery about unforeseen and unlimited liability are illusory, as the Uniform Commercial Code offers ample protection to manufacturers and other sellers. * * * In this regard, the UCC allows manufacturers to restrict their liability by exclusion and modification of implied warranties, and the provisions creating implied warranties are carefully tailored. Also, and quite importantly, with respect to the

---

**2.** This case presents a clear example of the inequity created by releasing the seller from its warranty obligations on account of the resale. The majority points out:

Gold'n Plump did not purchase the disputed machines unwittingly. Theis, the plant manager, who had negotiated the machine purchase from Simmons in December, transferred to the same position with Gold'n Plump. From this, one may infer that Gold'n Plump knew the machines were not functioning properly at the time it purchased them from Armour. Yet, the majority also states:

Under the plant sale agreement, Gold'n Plump paid Armour "net book value" for the two Simmons machines. This was $113,400 or the full purchase price which Armour had paid Simmons, despite testimony of Theis and other Gold'n Plump witnesses that the machines were worthless.

Thus, Gold'n Plump paid full price for machines it knew were worthless. The only rational explanation for this is that Gold'n Plump believed Simmons would keep its promise to make the machines function within reasonable tolerances or refund the purchase price. That Simmons continued to attempt to repair the machines also indicates that it believed it had a continuing obligation with respect to the machines.

recovery of lost profits, the Code allows recovery only if the loss was foreseeable by the seller. *See* Minn.Stat. § 336.2–715(2)(a). Finally, the Minnesota cases, while they have not addressed the precise issue presented here, have continually rejected the artificial notion that privity of contract should bar recovery. *Id.* 485 F.Supp. 793, 804 (citations omitted).

This Court should not create a situation in which sellers could so easily defeat warranty provisions they have voluntarily created. Thus, I would hold that Gold'n Plump may maintain an action based upon the express warranty Simmons voluntarily created in its February 14, 1983, letter to Armour.[3]

Finally, with respect to remedy, the district court found that even if Gold'n Plump could enforce the express warranty against Simmons, recovery should be denied because Gold'n Plump failed to properly establish damages for breach of warranty. Minn.Stat. § 336.2–714(2) (1966) provides:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted unless special circumstances show proximate damages of a different amount.

Since Gold'n Plump failed to introduce any evidence at trial as to the difference in value of the machines as accepted and as warranted, the court found that even if Gold'n Plump could have enforced the warranty, recovery was properly denied due to a failure of proof.

Although Minn.Stat. § 336.2–714(2) provides the usual measure of damages, it is not the sole remedy available for breach of warranty. Minn.Stat. § 336.2–719(1)(a) allows parties to "provide for remedies in addition to or in substitution for those provided in this article." Thus, if the parties agree to a measure of damages for breach of warranty different from that provided by Minn.Stat. § 336.2–714(2), courts should enforce the measure in the same manner as any other contract term, provided there is no showing that it represents a penalty or is unconscionable. *See* Minn.Stat. § 336.2–719 comment 1 ("Under this section parties are free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect."). *Cf.* Minn.Stat. § 336.2–718 (1966) (liquidated damages provision); Minn.Stat. § 336.2–719(2) and (3) (1966) (limitations on modification of remedy).

In this case, the express warranty created by Simmons in the letter of February 14, 1983, contained two terms. The first was that the machines would function within reasonable tolerances. The second was that if the machines did not so function, Simmons would return all monies paid for the equipment. The second term represents an agreement to substitute a refund of all monies paid for the usual remedy provided by Minn.Stat. § 336.2–714(2). The district court failed to give effect to the agreed term by applying the remedy provided in Minn.Stat. § 336.2–714(2). Thus, the court significantly altered the contract by ignoring a mutually agreed upon and bargained for term.

---

**3.** By so holding, it would be unnecessary to reach the issues addressed by the majority concerning Armour's assignment of its contract rights against Simmons to Gold'n Plump and Gold'n Plump's ability to enforce any implied warranty of fitness for a particular purpose as the alter ego of Armour. I note, however, that the majority opinion analyzes both of these issues as raising the question whether Gold'n Plump can assert warranty rights arising out of the original contract of sale between Armour and Simmons before it was modified by Simmons's letter of February 14, 1983. The analysis, however, fails to explain why Minn.Stat.

§ 336.2–318 is not applicable to any warranties that may have been included in the original contract. Since Minn.Stat. § 336.2–318, by its terms applies to "[a] seller's warranty whether express or implied," I can see nothing preventing Gold'n Plump from enforcing the original contract warranties except insofar as they may have been modified by the February 14, 1983, letter. In this light, the assignment and alter ego issues are unimportant because Minn.Stat. § 336.2–318 abolishes privity requirements for recovery under any warranties that may have been included in the original contract as well as the express warranty in the February 14 letter.

In this light, Gold'n Plump's failure to offer evidence as to the difference in value of the goods as warranted and the goods as accepted is entirely reasonable. The warranty under which Gold'n Plump asserts its rights contains its own bargained for remedy. To require Gold'n Plump to introduce evidence relevant to the remedy provided in Minn.Stat. § 336.2–714(2) would be to allow Simmons to walk away from the bargain it made. This we should not do. I would instead hold Simmons to its bargain by allowing Gold'n Plump to enforce the express warranty according to its terms, and award Gold'n Plump a refund of the $113,-400 purchase price.